**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**

| | |
|---|---|
| SOLOMON LIPSHUTZ and JEWELTEX MANUFACTURING INC. RETIREMENT PLAN, derivatively on behalf of CITIGROUP INC.,<br><br>*Plaintiffs*,<br><br>v.<br><br>ELLEN M. COSTELLO, GRACE E. DAILEY, BARBARA J. DESOER, JOHN C. DUGAN, JANE S. FRASER, DUNCAN P. HENNES, PETER BLAIR HENRY, S. LESLIE IRELAND, RENEE J. JAMES, GARY M. REINER, DIANA L. TAYLOR, and JAMES S. TURLEY,<br><br>*Defendants*,<br><br>and<br><br>CITIGROUP INC.,<br><br>*Nominal Defendant*. | No. |

**VERIFIED STOCKHOLDER DEMAND REFUSED**
**DERIVATIVE COMPLAINT**

Plaintiffs Solomon Lipshutz ("Lipshutz") and Jeweltex Manufacturing Inc. Retirement Plan ("Jeweltex," and collectively with Lipshutz, the "Plaintiffs"), by and through their undersigned counsel, respectfully submit this Verified Stockholder Demand Refused Derivative Complaint in the name of and on behalf of nominal defendant Citigroup Inc. ("Citigroup" or the "Company") against certain of its directors and officers named herein (the "Individual Defendants," as defined below, and collectively with Citigroup, the "Defendants"). Plaintiffs base their allegations on personal knowledge as to their own acts and on information and belief as to all

other allegations, based upon due investigation by their counsel, including: (a) review and analysis of public filings made by Citigroup with the United States Securities and Exchange Commission ("SEC"); (b) review and analysis of press releases and other publications caused or allowed to be disseminated by the Company, certain of the Defendants and other persons; (c) review of Court orders and filings, news articles, shareholder communications, and postings on Citigroup's website concerning the Company's public statements and the conduct of the Individual Defendants; and (d) review of other publicly available information concerning Citigroup, the Individual Defendants and other persons and entities.

## INTRODUCTION

1. Citigroup, through its wholly owned subsidiaries, is a systemic and repeat offender that has failed to comply with and implement multiple regulatory orders and safe and sound banking practices which require specific implementation and maintenance of internal controls, oversight over enterprise-wide risk management, compliance risk management, and data governance commensurate with the size, complexity and risk profile of Citigroup.

2. These material deficiencies were repeatedly flagged by numerous regulators over several years, but were largely ignored by the Individual Defendants. These orders, warnings and demands for compliance came from the Office of the Comptroller of the Currency (the "OCC"), Federal Reserve System (the "Federal Reserve"), Securities and Exchange Commission (the "SEC"), Consumer Financial Protection Bureau (the "CFPB"), Federal Deposit Insurance Corporation ("FDIC"), California Department of Financial Institutions (the "CDFI"), Commodity Futures Trading Commission (the "CFTC"), Financial Industry Regulatory Authority ("FINRA"), U.S. Department of Justice ("DOJ"), the U.K.'s Financial Services Authority (the "FSA"), the

U.K.'s Financial Conduct Authority (the "FCA"), and the Japanese Financial Services Authority ("JFSA").

3. As a result, Citigroup has been fined billions of dollars for myriad legal violations by these regulators, who expressly found that the Company: engaged in "unsafe and unsound banking practices"[1] and "failed to implement and maintain an enterprise-wide risk management and compliance risk management program, internal controls, or a data governance program commensurate with the Bank's size, complexity, and risk profile."[2] Indeed, regulators have found the Board and senior management to be responsible for this misconduct, determining that: "Board and senior management oversight is inadequate to ensure timely, appropriate actions to correct the serious and longstanding deficiencies and unsafe or unsound practices in the areas of risk management, internal controls, and data governance at the bank."[3]

4. As a consequence of this conduct and systemic failure to exercise prudence, due diligence, and oversight of the Company's core businesses, the Individual Defendants caused the Company to engage in unsafe and unsound practices to the detriment of Citigroup and its stockholders, its customers, and its business partners.

5. The Individual Defendants, however, persist in their indolence and have failed to take action to implement effective internal controls, risk management, and data governance practices. As a result, Citigroup and its stockholders continue to be damaged and the Company's reputation irreparably harmed. Indeed, in October 2020, Citigroup was fined $400 million by the OCC and Federal Reserve after more than a dozen years of reprimands, admonishments, and earlier fines by regulators, and published new Orders, agreed to by the Board, rebuking Citigroup for

[1] OCC Consent Order (October 7, 2020), *infra*, ¶¶ 140-42.
[2] Id. at ¶ 140.
[3] Id. at ¶ 142.

enterprise-wide internal controls and risk-management deficiencies, requiring new remedial efforts, and imposing significant restrictions on Citigroup's operations going forward. The new orders confirmed that the Board failed to prioritize necessary reforms, that the Company failed to implement or maintain enterprise-wide internal controls and risk-management systems, and that, as a result, the Company remained in violation of several past governmental Orders. The new Orders revealed the scale of the Board's failure to prioritize reforms and take compliance seriously.

6. The Individual Defendants' misconduct also resulted in "one of the biggest blunders in banking history" - resulting from years of inadequate internal controls and woefully deficient oversight procedures, when the Company erroneously paid $900 million of its own money to creditors of Revlon Inc. ("Revlon"), a company which is in bankruptcy, exposing as false the Company's claims of implementing adequate and proper internal controls and procedures. As a result, hundreds of millions of dollars of Company money flew out the door unchecked, and Citigroup's reputation was severely damaged.

7. Moreover, in the ensuing litigation between Citigroup and the recalcitrant Revlon creditors who were mistakenly paid by Citibank out of its own funds even before payment was due from Revlon, and whose refusal to return the funds paid by the bank has been upheld in litigation brought by the Company, Citibank's own Global Head of Loan and Credit Risk Services Operations, Brendan Zeigon, testified that Citibank lacked any internal controls that would have caught the mistaken $900 million payment and prevented it.

8. Beginning October 2020, the Company and certain of its officers and directors were named defendants in three putative class action complaints filed in the United States District Court for the Southern District of New York on behalf of purchasers of Citigroup securities between February 25, 2017 and October 12, 2020, inclusive (the "Class Period"). The actions were later

consolidated under the caption *In re Citigroup Sec. Litig*, No. 1:20-CV-9132 (S.D.N.Y.), and assert violations of Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 in connection with defendants' alleged misstatements concerning Citigroup's internal controls during the Class Period (the "Securities Class Action"). The consolidated complaint names Michael L. Corbat ("Corbat"), Ellen M. Costello ("Costello"), Grace E. Dailey ("Dailey"), Barbara Desoer ("Desoer"), John C. Dugan ("Dugan"), Duncan P. Hennes ("Hennes"), Peter Blair Henry ("Henry"), S. Leslie Ireland ("Ireland"), Renee J. James ("James"), James S. Turley ("Turley"), and Alexander Wynaendts ("Wynaendts"), among others, as defendants. Defendants moved to dismiss the consolidated amended complaint, which motion remains pending.

9. Plaintiffs Lipshutz and Jeweltex demanded that Citigroup's Board take action to recover its damages from those who caused this material harm, that it cure the internal control and governance deficiencies, and that it remediate its unsafe and unsound practices. While Plaintiffs have attempted to cooperatively work with the Company, their demand has been rejected.

10. The decision of the Citigroup Board to refuse Plaintiffs' Demand is not entitled to protection under the business judgment rule since it is neither rational nor the product of a vote by disinterested and independent directors and was not informed by a reasonable investigation nor by disinterested and independent directors. Rather, the purported investigation by the Demand Review Committee ("DRC"), upon which the Board purported to have relied, was tainted by conflicts and the failure to adequately investigate the very serious issues raised. As such, Plaintiffs bring this action for the benefit of Citigroup to recover the Company's damages, cause the implementation of the demanded internal control and governance practices and procedures, and remediate the unsafe and unsound conditions at Citigroup.

## JURISDICTION AND VENUE

11. The Court has jurisdiction over the causes of action asserted under Section 14(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), and Rule 14a-9 promulgated thereunder by the SEC, pursuant to 28 U.S.C. § 1331 and Section 27 of the Exchange Act. Supplemental Jurisdiction over the remaining claims exists pursuant to 28 U.S.C. § 1367.

12. The Court has jurisdiction over each Defendant. Citigroup conducts business and maintains its corporate headquarters in this District, which renders the Court's exercise of jurisdiction permissible under the traditional notions of fair play and substantial justice. The Individual Defendants, as corporate officers or directors of Citigroup, have sufficient minimum contacts with this District to render the exercise of jurisdiction by this Court permissible under traditional notions of fair play and substantial justice.

13. Pursuant to 28 U.S.C. § 1391(a), venue is proper in this District where Citigroup maintains its corporate headquarters, where a substantial portion of the transactions and wrongs complained of herein occurred, and where the Individual Defendants, as corporate officers and directors of Citigroup, have received substantial compensation and have engaged in numerous activities that had an effect in this District.

## THE PARTIES

14. Plaintiffs are shareholders of Citigroup and have continuously owned Citigroup common stock at all relevant times.

15. Nominal Defendant Citigroup is incorporated in Delaware and maintains its global headquarters in New York, New York. The Company is a diversified financial services company that provides retail, commercial and corporate banking services through banking stores and offices, the internet and other distribution channels to individuals, businesses and institutions in all 50

states, the District of Columbia and in other countries. The Company provides other financial services through subsidiaries engaged in various businesses, principally: wholesale banking, mortgage banking, consumer finance, equipment leasing, agricultural finance, commercial finance, securities brokerage and investment banking, insurance agency and brokerage services, computer and data processing services, trust services, investment advisory services, mortgage-backed securities servicing and venture capital investment.

16. Defendant Ellen M. Costello is a Citigroup director since 2016 and serves on its Audit Committee and Risk Management Committee. According to Citigroup's 2022 Proxy Statement, she received $417,917 in compensation in 2021 and beneficially owns 41,532 shares of the Company's stock. She is a named defendant in the Securities Class Action.

17. Defendant Grace E. Dailey is a Citigroup director since January 2019 and serves on its Audit Committee and Risk Management Committee. According to Citigroup's 2022 Proxy Statement, she received $401,667 in compensation in 2021 and beneficially owns 5,216 shares of the Company's stock. She is a defendant in the Securities Class Action.

18. Defendant Barbara J. Desoer is a Citigroup director since 2019 and serves on its Executive Committee, Technology Committee, and Risk Management Committee. She is also Chair of Citibank, N.A. since 2019. According to Citigroup's 2022 Proxy Statement, she received $442,500 in compensation in 2021 and beneficially owns 86,958 shares of the Company's stock. She is a defendant in the Securities Class Action.

19. Defendant John C. Dugan is the Chair of the Citigroup Board since January 2019 and director since October 2017. He serves on its Audit Committee, Technology Committee, Nomination, Governance and Public Affairs Committee (the "NGPAC"), and Risk Management Committee, and Chairs its Executive Committee and Compensation, Performance Management

and Culture Committee (the "CPMCC"). According to Citigroup's 2022 Proxy Statement, he received $725,000 in compensation in 2021 and beneficially owns 21,527 shares of the Company's stock. He is a defendant in the Securities Class Action.

20. Defendant Jane S. Fraser is the CEO of Citigroup since February 2021 and a director since 2020. She served as President of Citi and CEO of the Global Consumer Bank, CEO of Citigroup Latin America from 2015 to 2016, CEO of U.S. Consumer and Commercial Banking and Citi Mortgage from 2013 to 2015, CEO of Citi's Global Private Bank from 2009 to 2013, and Global Head of Strategy and Mergers & Acquisitions from 2007 to 2009. She joined Citi in 2004 in the Corporate and Investment Banking Division. According to Citigroup's 2022 Proxy Statement, she received $22,500,000 in compensation in 2021 and beneficially owns 124,141 shares of the Company's stock. Defendant Fraser is referred to herein as the "Officer Defendant."

21. Defendant Duncan P. Hennes is a Citigroup director since 2013, and is a member of its Risk Management Committee, Executive Committee, and Technology Committee. According to Citigroup's 2022 Proxy Statement, he received $460,833 in compensation in 2021 and beneficially owns 24,190 shares of the Company's stock. He is a defendant in the Securities Class Action.

22. Defendant Peter Blair Henry is a Citigroup director since 2015 and member of the CPMCC and the NGPAC. According to Citigroup's 2022 Proxy Statement, he received $365,417 in compensation in 2021 and beneficially owns 35,231 shares of the Company's stock. He is a defendant in the Securities Class Action.

23. Defendant S. Leslie Ireland is a Citigroup director since 2017 and serves on its Technology Committee. According to Citigroup's 2022 Proxy Statement, he received $330,000 in

compensation in 2021 and beneficially owns 10,437 shares of the Company's stock. He is a defendant in the Securities Class Action.

24. Defendant Renee J. James is a Citigroup director since 2016 and serves on its Audit Committee, Executive Committee, Technology Committee, and CPMCC. According to Citigroup's 2022 Proxy Statement, she received $346,250 in compensation in 2021 and beneficially owns 16,871 shares of the Company's stock. She is a defendant in the Securities Class Action.

25. Defendant Gary M. Reiner is a Citigroup director since 2013 and serves on its Technology Committee, NGPAC and the CPMCC. According to Citigroup's 2022 Proxy Statement, he received $317,804 in compensation in 2021 and beneficially owns 24,705 shares of the Company's stock.

26. Defendant Diana L. Taylor is a Citigroup director since 2009 and a director of Citibank N.A. since 2020. She Chairs Citigroup's NGPAC, and is a member of its Executive Committee, and the CPMCC. According to Citigroup's 2022 Proxy Statement, she received $476,667 in compensation in 2021 and beneficially owns 41,804 shares of the Company's stock.

27. Defendant James S. Turley is a Citigroup and Citibank N.A. director since July 2013 and serves as Chairman of Citigroup's Audit Committee, and member of its Executive Committee and Risk Management Committee. According to Citigroup's 2022 Proxy Statement, he received $415,417 in compensation in 2021 and beneficially owns 25,316 shares of the Company's stock. He is a defendant in the Securities Class Action.

28. Defendants Costello, Dailey, Desoer, Dugan, Fraser, Hennes, Henry, Ireland, James, Reiner, Taylor, and Turley are collectively referred to as the "Director Defendants."

29. The Officer Defendant and the Director Defendants are collectively referred to herein as the "Individual Defendants."

## DESCRIPTION OF RELEVANT NON-PARTIES

30. Alexander Wynaendts was a Citigroup director from 2019 until his resignation in November 2021. He previously served as CEO and Chairman of the Executive Board of Aegon N.V. ("Aegon") from 2008 until 2020. Wynaendts was a member of the DRC until his resignation in November 2021. He also served as a director of Citigroup Global Markets Limited, an international subsidiary of Citigroup, until his resignation in November 2021. Wynaendts served as a member of the Company's Personnel and Compensation Committee and Risk Management Committee. According to Citigroup's 2021 Proxy Statement, he received $307,500 in compensation in 2020 and beneficially owns 2,712 shares of the Company's stock. He is a defendant in the Securities Class Action.

## THE INDIVIDUAL DEFENDANTS' DUTIES

### A. Fiduciary Duties

31. By reason of their positions as officers, directors, and/or fiduciaries of Citigroup and because of their ability to control the business and corporate affairs of Citigroup, the Individual Defendants owed and owe the Company and its shareholders the highest fiduciary obligations of loyalty, good faith, and due care, and were and are required to use their utmost ability to control and manage Citigroup in a fair, just, lawful, honest, and equitable manner, and were and are required to assure that reasonable and adequate compliance and internal controls and effective corporate governance practices and procedures were in place. The Individual Defendants were and are required to act in furtherance of the best interests of Citigroup and its shareholders so as to benefit all shareholders equally and not in furtherance of their own personal interests.

32. The Individual Defendants, because of their positions of control and authority as directors and/or officers of Citigroup, were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein. Because of their advisory, executive, managerial, and directorial positions with Citigroup, each of the Individual Defendants had knowledge of material non-public information regarding the Company. In addition, as officers and/or directors of a publicly held company, the Individual Defendants had a duty to promptly disseminate accurate and truthful information with regard to the Company's operations and affairs so that the market price of the Company's stock would be based on truthful and accurate information. To discharge their duties, the officers and directors of Citigroup were required to exercise reasonable and prudent supervision over the management, policies, practices, and controls of the Company. By virtue of such duties, Citigroup's officers and directors were required to, among other things:

a. Exercise good faith to ensure that the affairs of the Company were conducted in a lawful, efficient, business-like manner so as to make it possible to provide the highest quality performance of their business;

b. Exercise good faith to ensure that the Company was operated in a diligent, honest and prudent manner and complied with all applicable federal and state laws, rules, regulations and requirements, and all contractual obligations, including acting only within the scope of its legal authority; and

c. Refrain from trading on material, adverse, non-public information.

**B. <u>Additional Fiduciary Duties of the Audit Committee</u>**

33. In addition to the foregoing duties, the members of the Audit Committee owed additional specific duties to Citigroup under the Audit Committee's Charter to review and approve quarterly and annual financial statements, and to ensure that the Company had appropriate and effective internal controls over financial transactions and reporting.

34. Specifically, the Audit Committee is responsible for assisting the Board of Directors in fulfilling their oversight responsibilities to shareholders in the following areas, among others:

- The integrity of Citigroup's consolidated financial statements, financial reporting process and systems of internal accounting and financial controls;
- Any significant deficiencies or material weaknesses in the design or operation of Citigroup's internal control over financial transactions and reporting;
- The key guidelines and policies governing Citigroup's significant processes for risk assessment and risk management; and
- Review and assess at least annually whether Citi's Ethics Code for Financial Professionals instills appropriate ethical behavior in Citi's employees and approve any changes.

35. The Audit Committee Charter requires its members to review and discuss with management specific areas of compliance concerning:

- Review periodically with management, including the Citigroup Chief Risk Officer, the Chief Compliance Officer and the General Counsel, and the Independent Auditors, any significant correspondence with, or other action by, regulators or governmental agencies, any material legal affairs of Citigroup and Citigroup's compliance with applicable law and listing standards.
- Oversee and receive reports on regulatory control issues, including regular updates on significant long-term projects being implemented in response to particular regulatory issues or concerns, except to the extent another Committee of the Board receives reports on specific regulatory projects.
- Receive periodic briefings on the key controls and processes in specific business or functional areas, in particular with respect to areas that are the subject of regulatory concern.
- Receive periodic briefings on the Company's control environment, including the remediation of identified control issues and the overall effectiveness of the Company's controls framework.
- Review whether senior management has established appropriate incentives to integrate compliance objectives into the management goals, performance reviews and compensation structure across Citigroup, and that appropriate actions and other measures are taken when compliance failures are identified, including disciplinary actions for serious compliance failures.

- Annually review and approve management's evaluation of the effectiveness of Citigroup’s systems and processes used to calculate risk-based capital requirements.

36. Defendants Costello, Dailey, Dugan, Hennes, James and Turley (the “Audit Committee Defendants”) served on the Audit Committee during the Relevant Period. By accepting appointments to serve on the Audit Committee, these Defendants undertook to fulfill the requirements of its Charter in good faith. The events that have transpired, as alleged herein, demonstrate that the Audit Committee Defendants breached their fiduciary duties of loyalty and good faith in failing, *inter alia*, to identify, maintain, and manage key areas of risk facing Citigroup; to ensure the quality and integrity of the Company’s financial reporting process; to ensure the quality and integrity of the Company’s internal controls and procedures for financial reporting (and disclosures of same to shareholders); to monitor and correct the Company’s regulatory control issues and processes; to remediate the Company’s control environment, including remediation of identified control issues and overall effectiveness of the Company’s control framework; to obtain regular updates from management and Company counsel regarding compliance matters and legal matters that may have a significant impact on the financial statements; and to scrutinize the Company’s enterprise risk management framework, including the significant policies, procedures and practices employed to manage, monitor and control risk and the Company’s exposure thereto, including reputation risk.

## C. <u>Additional Fiduciary Duties of the Risk Management Committee</u>

37. The members of the Risk Management Committee owed additional specific duties to Citigroup and its shareholders under the Risk Management Committee’s Charter to serve as a focal point for enterprise-wide risk issues, overseeing all key risks facing the Company.

38. Specifically, the Risk Management Committee is responsible for assisting the Board of Directors in fulfilling their oversight responsibilities to shareholders in the following areas by, among other things:

- Review and consider for approval, Citigroup's Enterprise Risk Management Framework at least annually.
- Review Citigroup's risk appetite framework and recommend approval to the Board.
- Review quarterly Citigroup's risk profile in relation to its Board-approved risk appetite.
- Review and approve Citigroup's key risk policies on the establishment of risk limits and receive reports on Citigroup's adherence to significant limits.
- Review and make recommendations to the Board with respect to the Board's annual approval of Citigroup's Liquidity Risk Management Policy (the "LRMP").
- Evaluate the adequacy of the Risk Management function, and the qualifications and background of selected senior risk officers.
- Review the qualifications of the senior-level staff of the Risk Management function, and review the adequacy of the staffing of the function to perform its role in appropriate depth and frequency.
- Review the independence and authority of the Risk Management function.
- Review Citigroup's balance sheet, capital, funding, interest rate and liquidity management framework, including significant policies, processes, and systems that management uses to manage risk exposure.
- Review reports from management concerning Citigroup's balance sheet structure including management of the Citigroup's funding profile.
- Review reports from management concerning Citigroup's liquidity, deposit raising, and funding activities and metrics and, if applicable, their sufficiency relative to management's standards.
- Review reports from management concerning Citigroup's regulatory capital levels and capital structure and metrics, as well as sufficiency relative to management's and/or regulatory standards.
- Review and make recommendations to the Board with respect to the Board's annual approval of the Omnibus Funding Resolutions.

- Review and approve a written talent management program that provides for the development, recruitment and succession planning regarding the Head of Citigroup Global Risk Review ("GRR"), his direct reports and other potential successors.

39. The Risk Committee Charter requires its members to review and discuss with management specific areas of compliance concerning risk coverage and risk profile:

- Receive reports from, review with, and provide feedback to, management on the categories of risk Citigroup faces, including credit, market (including trading and non-trading), liquidity, strategic, operational, compliance and reputation, the risk profile for each category, significant concentrations within those risk categories, the metrics used to monitor exposure and management's views on the acceptable and appropriate levels of risk.

- Review Citigroup's credit, market (including trading and non-trading), liquidity, strategic, operational, compliance and reputation risk management frameworks, including significant policies, processes and systems that management uses to manage risk exposures, as well as risk measurement methodologies and approaches to stress testing.

40. Defendants Costello, Dailey, Desoer, Dugan, Hennes, and Turley (the "Risk Management Committee Defendants") sat on the Risk Management Committee during the Relevant Period. By accepting appointments to serve on the Risk Management Committee, these Defendants undertook to fulfill the requirements of its Charter in good faith.

41. The events that have transpired, as alleged herein, demonstrate that the Defendants who sat on the Risk Management Committee breached their fiduciary duties of loyalty and good faith in failing, inter alia, to identify, maintain, and manage key areas of risk facing Citigroup, to ensure the quality and integrity of the Company's financial transactions and reporting process, and to ensure the quality and integrity of the Company's internal controls and procedures for financial transactions and reporting (and disclosures of same to shareholders).

## D. Additional Fiduciary Duties of the CPMCC

42. The members of the CPMCC owed additional specific duties to Citigroup and its shareholders under the CPMCC's Charter regarding the implementation of risk-balancing and risk management methodologies for incentive compensation plans and programs for senior executives.

43. Specifically, the CPMCC is responsible for assisting the Board of Directors in fulfilling its responsibilities relating to the overall compensation strategy for the Company and the compensation of the Company's executive officers by, among other things:

- Reviewing Citi's management resources and the performance of senior management;
- Determining the compensation for the Chief Executive Officer ("CEO") and approving the compensation of other executive officers of the Company and members of Citi's Executive Management Team;
- Approving the incentive compensation structure for other members of senior management and certain highly compensated employees; and
- Broad oversight over compliance with bank regulatory guidance governing Citi's incentive compensation.

44. Defendants Dugan, Hennes, Henry, James, Reiner, and Taylor sat on the CPMCC during the Relevant Period. By accepting appointments to serve on the CPMCC, these Defendants undertook to fulfill the requirements of its Charter in good faith.

45. The events that have transpired, as alleged herein, demonstrate that the Defendants who sat on the CPMCC breached their fiduciary duties of loyalty and good faith in failing, inter alia, to identify, maintain, and manage key areas of risk facing Citigroup, to ensure the proper alignment of resources and performance of senior management, and to vigorously oversee compliance with regulatory guidance.

**E. Additional Fiduciary Duties of the NGPAC**

46. The members of the NGPAC owed additional specific duties to Citigroup and its shareholders under the NGPAC Charter regarding the Company's corporate governance practices.

47. Specifically, the NGPAC is responsible for the Company's corporate governance guidelines by, among other things:

- Periodically assessing the effectiveness of the Board in meeting its responsibilities, representing the long-term interests of stockholders;
- Overseeing, receiving reports from and advising management on reputational risks related to Citi's businesses, policies and practices, except to the extent that such reputational risks are within the scope of responsibility of another committee of the Board; and
- Preserving Citibank's safety and soundness, with the understanding that Citibank's interests will not be subordinated to the interests of Citibank's parent holding companies in a manner that jeopardizes Citibank's safety and soundness.

48. Defendants Dugan, Henry, Reiner and Taylor (the "NGPAC Defendants") sat on the NGPAC during the Relevant Period. By accepting the appointment to serve on the NGPAC, the NGPAC Defendants undertook to fulfill the requirements of its charter in good faith.

49. The events that have transpired, as alleged herein, demonstrate that the NGPAC Defendants breached their fiduciary duties of loyalty and good faith in failing, *inter alia*, to assess the reputational risks facing the Company, preserve the Company's soundness and safety, and monitor the effectiveness of the Board and the stockholders' long-term interests.

**F. Additional Fiduciary Duties of the Technology Committee**

50. The members of the Technology Committee owed specific duties to Citigroup and its shareholders under the Technology Committee's Charter regarding the planning and executing of the Company's technology strategy and operating plan.

51. Specifically, the Technology Committee is responsible for formulating and executing the Company's technology matters, and advising the Board and management on

strategies that affect the Company's role and reputation as a socially responsible organization by, among other things:

- Reviewing and receiving reports from, and providing feedback to, Technology Management and Risk Management on the Company's risk management framework, risk appetite and policies relating to technology risk, including Cyber Security.

- Reviewing and receiving reports from, and providing feedback to, Technology Management and Risk Management on significant technology risk exposures, including risks related to information security, fraud, data protection, business continuity, third-party and Cyber Security, as well as the steps management has taken to monitor and control such risks; including, if applicable, technology risk issues referred from the Risk Management Committee.

- Receive and discuss reports from Enterprise Operations and Technology ("EO&T"), Institutional Clients Group Operations and Technology ("ICG O&T"), and Personal Banking and Wealth Management ("PBWM") Technology relating to Technology Change Management.

52. Defendants James, Desoer, Dugan, Ireland, and Reiner (the "Technology Committee Defendants") sat on the Technology Committee during the Relevant Period. By accepting appointments to serve on the Technology Committee, the Technology Committee Defendants undertook to fulfill the requirements of its Charter in good faith.

53. The events that have transpired, as alleged herein, demonstrate that the Technology Committee Defendants breached their fiduciary duties of loyalty and good faith in failing, inter alia, to identify, maintain, and manage key areas of risk facing Citigroup, including but not limited to the Company's risk management framework, risk appetite, policies relation to technology risk, and the monitoring and controlling of such risks.

## G. Control, Access, and Authority

54. The Individual Defendants, because of their positions of control and authority as directors and/or officers of Citigroup, were able to and did, directly and/or indirectly, exercise control over the wrongful acts and failures to act complained of herein.

55. At all times relevant hereto, each of the Individual Defendants was the agent of each of the other Individual Defendants and of Citigroup and was at all times acting within the course and scope of such agency.

## BREACHES OF DUTIES

56. The conduct of the Individual Defendants complained of herein involves knowing and culpable violations of their obligations as officers and directors of Citigroup, the absence of good faith on their part, and a reckless disregard for their duties to the Company and its shareholders, which the Individual Defendants were aware or should have been aware posed a risk of severe harm to the Company.

57. The Individual Defendants violated, or failed to prevent others from violating, sound and safe banking practices and procedures, securities and banking laws, rules and regulations, and regulatory orders, subjecting the Company to substantial liability. As a result of this and other breaches of fiduciary duties, Citigroup has expended, and will continue to expend, significant sums of money.

58. The Individual Defendants, because of their positions of control and authority as officers and/or directors of Citigroup, were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein, which resulted in substantial harm to Citigroup.

59. As directors and/or officer of Citigroup, the Individual Defendants either knew, consciously disregarded, and/or were reckless and grossly negligent in not knowing that the adverse, non-public information about Citigroup's business, operations, prospects, internal controls, and financials, including the Company's internal accounting and controls over the Company because of their access to internal corporate documents, conversations and

communications with one another as well as other corporate officers and employees, attendance at Board meetings, and committee meetings thereof, as well as reports and other information provided to them in connection therewith.

60. The Individual Defendants participated in, caused, failed to correct, and/or failed to take action to remedy the harm inflicted upon Citigroup through the wrongful conduct set forth herein. In committing the wrongful acts alleged herein, and failing to implement and oversee sound and safe baking practices and procedures, the Individual Defendants have pursued, or joined in the pursuit of, a common course of conduct, and have acted in concert with and conspired with one another in furtherance of their wrongdoing. The Individual Defendants aided and abetted and/or assisted each other in breaching their respective duties.

## STATEMENT OF FACTS

### A. Citigroup's Business

61. Citigroup is a New York-based multinational investment bank and financial services corporation.

62. Citigroup is one of the "big four" banks in the U.S. and has a significant global presence. Due to the nature of the Company's business, Citigroup operations are subject to significant legal and regulatory requirements, which include, but are not limited to, regulation, examination, and supervision by, among others, the OCC and the Federal Reserve.

### B. The Long Trail Of Citigroup Failures Of Fiduciary Duty Demonstrated By Regulators

***a. 2003***

63. In July 2003, Citigroup: (i) entered into Written Agreements with the Federal Reserve Bank of New York ("FRBNY") and the OCC requiring reforms to address deficiencies identified upon a regulatory review of the Company's internal controls and risk-management

practices; (ii) agreed to pay $3.7 billion to settle claims by Enron's investors and bankruptcy estate; and (iii) paid $100 million in civil penalties to the SEC for having structured transactions that allowed Enron to manipulate its financial statements, which were found by the OCC to result from Citigroup's deficient internal policies and failed controls incapable of preventing the manipulative transactions from going forward due to Citigroup's sprawling size and disorganization of internal systems.

64. Consequently, the OCC demanded that the Company "establish systems to ensure appropriate coordination and communication between various business lines involved in or affected by complex structured finance transactions."

65. The OCC also required the Company to implement new internal controls relating to structured finance transactions and "enhanced compliance processes to ensure adherence to applicable Bank policies, laws, rules, and regulations." The OCC reminded the Company that the "Board has the ultimate responsibility for proper and sound management of the Bank." Similarly, the Company's agreement with the FRBNY required Citigroup to specifically "analyze whether [its] risk identification mechanisms … are adequate and result in effective measurement and control customer exposure across Citigroup's consolidated organization."

66. The FRBNY mandated that Citigroup implement new oversight procedures and directed Citigroup to "require participation by control functions in all relevant areas, including legal, credit, and accounting, in transaction approval and monitoring, and to ensure that effective processes are in place for the escalation of matters."

***b. 2004***

67. In 2004, Citigroup failed to oversee its European bond traders who illegally manipulated the European bond market, in a scheme internally referred to as "Dr. Evil." Later, in

June 2005, the FSA fined Citigroup approximately $25 million for the misconduct and found that the Company "failed to take reasonable care to organize and control its affairs responsibly and effectively and to implement adequate management systems" as there were "inadequate systems for supervision of traders."[4]

68. In addition, in September 2004, the JFSA ordered Citibank to shut down its private banking operations due to rampant violations of Japanese banking laws. According to an October 2004 *Japan Times* article, Citigroup's CEO at the time, Charles Prince, met with Japanese regulators and "apologized for the firm's inadequate governance and management structure in Japan."

***c. 2005***

69. In a January 31, 2005 letter to Citigroup, the OCC again told the Company that its "risk management practices need strengthening to help prevent the recurring control failures impacting the company." The OCC letter enclosed a memorandum explaining that Citigroup was looking at its individual businesses' operations too narrowly and that the Company needed to "focus beyond specific lines of business and adopt processes to more firmly encompass enterprise risk management." The OCC warned that "[e]arnings and profitability growth have taken precedence over risk management and internal control."

70. In March 2005, the Federal Reserve placed a moratorium on Citigroup's ability to make large acquisitions so that Citigroup's Board and management could focus on implementing enterprise-wide controls. The Federal Reserve noted that "an organization as large and varied as Citigroup has a particular need to adopt risk management practices that can appropriately address

---

[4] Https://www.nytimes.com/2005/06/29/business/worldbusiness/bond-trades-far-too-agile-cost-citigroup-25-million.html

the scope, complexity, and geographic diversity of its operations," and that "[g]iven the size, scope, and complexity of Citigroup's global operations, successfully addressing the deficiencies in compliance … will require significant attention over a period of time by Citigroup's senior management and board of directors." The moratorium was therefore put in place so that "management's attention" would not be "diverted" during the enterprise-wide risk-management system implementation process.

71. In December 2005, the OCC reported to Citibank its "disappointing" findings that, despite the moratorium, "the business grew far in excess of management's underlying infrastructure and control process." The OCC also noted that the already active "control functions raised questions as to the business's capacity to accommodate future growth, but warnings went unheeded." The OCC cautioned that, "given this oversight failure," it was "considering options" that would further limit Citigroup's growth and that "[m]anagement should reflect on how this situation occurred, and what structural or process changes are warranted to ensure that future growth is measured, monitored, and controlled in a way that is appropriate for a national bank."

***d. 2006***

72. In April 2006, the Federal Reserve and OCC lifted Citigroup's acquisition moratorium, notwithstanding their prior pronouncements and stern warnings to the contrary, according to the final Inquiry Report (the "National Commission Report") issued by the National Commission on the Causes of the Financial Crisis in the United States in January 2011, not because Citigroup cured its control problems or successfully implemented enterprise-wide risk-management systems, but because the Company assured regulators "that the bank would strive to meet the OCC's goals for improving risk management."

73. Indeed, an internal Federal Reserve memorandum from February 2006 explained, that regulators "met with senior management and certain Citigroup board members, and share[d] the view that the organization is committed to successfully addressing the supervisory issues." However, according to the Financial Crisis Report, "documents obtained . . . from the New York Fed give no indication that its examination staff had any independent knowledge of" Citigroup's progress in addressing its enterprise-wide management to monitor and control risks.

74. Notably, according to the Financial Crisis Report, "Citigroup had two key problems: a lack of effective enterprise-wide management to monitor and control risks and a lack of proper infrastructure and internal controls with respect to the creation of CDOs."

***e. 2007-2009; The Financial Crisis***

75. In truth, it was only more of the same for Citigroup after the lifting of the regulatory acquisition moratorium. Citigroup expanded in size while ignoring its pledge and duty to integrate internal controls and risk-management systems across its businesses. As repeatedly confirmed by experts:

• "Unsuccessful firms such as Citigroup … expanded in the years before the crisis, but failed to integrate their systems and business platforms to obtain the capacity to manage the entire disjointed company." Thomas H. Stanton, *Why Some Firms Thrive While Others Fail: Governance and Management Lessons from the Crisis* (Oxford University Press, 2012).

• "The risk management system at Citigroup suffered from business lines separated into silos without cross-cutting communication." *Id.*

• "Citigroup illustrates the problems that can occur absent" "a strong enterprise-wide infrastructure." *Id.*

• After the moratorium was lifted, Citigroup completed a rapid series of acquisitions, including purchases of several banks and securities firms as well as a large hedge fund, which eventually contributed to Citigroup's near demise. Professor Arthur E. Wilmarth Jr. in his *Citigroup: A Case Study in Managerial and Regulatory Failures*, 47 Ind. L. Rev. 69,119 (2013) (the "Citigroup Case Study").

• Indeed, in a February 2008 supervisory letter, the OCC referred to this post-moratorium activity as Citigroup's "aggressive acquisition program" and explained that with Citigroup's newfound regulatory freedom, "the previous focus on risk and compliance gave way to business expansion and profits." *Id.*

• Citigroup's woes were attributable to "**Citigroup's reckless growth, highly speculative activities, and shockingly inadequate risk controls**." *Id.* (Emphasis added).

76. In the official notes from a November 19, 2007 meeting between Citigroup and multiple regulators, including the Federal Reserve, the OCC, and the SEC, it is reported that Citigroup never implemented enterprise-wide risk management systems. In these notes, under the header "What Did Not Work Well" at the Company, it is reported that the Company had:

• "Poor communication across businesses: decentralized nature of the firm created silos";

• Unlike Citigroup's consumer banking operations, other parts of the Company still "established sizeable unhedged positions" in collateralized debt obligations ("CDOs");

• Because Citigroup "ran its business on a decentralized basis," the Company was harmed when "other parts of the firm were seeing early signs of deterioration in mortgage sector" but the "information was not effectively communicated to the CDO structuring business to take action";

• "The firm did not have a comprehensive view across credit, market, liquidity and financial/accounting risks of its various businesses";

• Citigroup "did not have an adequate, firm-wide consolidated understanding of its risk factor sensitivities"; and

• Citigroup management even conceded to its regulators "that it has to provide better risk management oversight to its business activities."

77. In the OCC's 2008 supervisory letter, the regulator reported that "the Board and senior management ha[d] not ensured an effective and independent risk management process [was] in place," and the Citibank Board "had no effective oversight role specific to the risk profile of the bank."

78. As a result of Citigroup's abysmal internal controls and risk-management systems, Citigroup was particularly devasted by the recession from 2007–2009 (the "financial crisis").

During that time, Citigroup recorded more than $130 billion in write-downs on loans and investments. To prevent Citigroup's collapse, the federal government injected $45 billion of new capital into the bank and provided the bank with $500 billion of additional assistance in the form of asset guarantees, debt guarantees, and liquidity assistance. Citigroup received more federal financial assistance than any other bank during the financial crisis. It was the largest bank bailout in history.

***f. 2012***

79. On April 5, 2012, the OCC issued a Consent Order, following the OCC's investigation of the Company's anti-money laundering internal compliance program. The OCC specifically found that Citibank suffered from "deficiencies in its BSA/AML [*i.e.*, Bank Secrecy Act/Anti-Money Laundering] compliance program" which were "due to an inadequate system of internal controls and ineffective independent testing."

80. The OCC found that the "internal control weaknesses" spanned "multiple areas of the bank" and resulted in an "inability to assess and monitor client relationships on a bank-wide basis." The OCC required Citibank to create a "Compliance Committee" consisting of at least three directors, two of whom must remain independent from the Company.

81. The OCC also ordered Citibank to develop a "BSA/AML Action Plan" requiring "timely reporting" to the bank's Board and that "corrective action be taken in a timely manner for any noncompliance." The Order instructed that "senior management" be held "accountable for effectively implementing bank policies and procedures" and required Citibank to "develop appropriate objectives and means to measure the effectiveness of compliance management officers and compliance management personnel within each line of business and for those with responsibilities across lines of business."

82. Furthermore, the OCC required Citibank to engage an independent consultant to assess the compliance program's "organizational structure," "enterprise-wide effectiveness," and "internal controls." The consultant's evaluation was required to assess "the AML risk associated with each line of business, and an enterprise-wide assessment of AML risk for higher risk products, customers, and services."

83. The OCC required the newly established Compliance Committee to submit quarterly reports to the Citibank Board "setting forth in detail the actions taken to comply with each Article of [the OCC's] order, and the results and status of those actions." The Citibank Board was also required to forward the written reports to the OCC for review.

84. On August 2, 2012, the FDIC and CDFI issued a Consent Order against Banamex USA, a Citigroup subsidiary, requiring Banamex USA's board to "increase its oversight of the affairs of the Bank" so that it was "consistent with the role and expertise commonly expected for the directors of banks of comparable size," expressly recognizing that the current oversight in place was insufficient.

85. The Consent Order required "compliance by the Bank with the BSA" and authorized regulators to determine whether the bank's current management and board members were qualified to "operate the Bank in a safe and sound manner" and "comply with applicable laws and regulations."

86. The Order also mandated that the bank retain a BSA Compliance Officer and called for annual independent testing of compliance with the BSA and all applicable rules and regulations. The independent testing was to address, among other things, the "overall integrity and effectiveness" of the compliance program, "BSA/AML risk assessment," "BSA reporting and

recordkeeping requirements," and the "integrity and accuracy of the management information systems used" in the compliance program.

***g. 2013***

87. On March 21, 2013, the Federal Reserve issued a Consent Order explicitly finding that "Citigroup lacked effective systems of governance and internal controls to adequately oversee the activities of [its subsidiary] Banks with respect to legal, compliance, and reputational risk related to the Banks' respective BSA/AML compliance programs."

88. The Consent Order required the Board to submit a written plan documenting what measures the Board implemented since the issuance of earlier OCC and FDIC orders and describing further measures the Board would take to ensure "that such compliance risk is effectively managed across Citigroup, including within and across business lines, support units, legal entities, and jurisdictions in which Citigroup and its subsidiaries operate."

89. Citigroup was also ordered to submit reports detailing the structure and standards of the BSA/AML compliance program, including the processes for monitoring subsidiaries' compliance with Citigroup's polices. The Federal Reserve also required independent testing "within Citigroup entities" to ensure compliance. Importantly, the Federal Reserve required that the Citigroup Board submit written quarterly progress reports to the Federal Reserve "detailing the form and manner of all actions taken to secure compliance with this Order, a timetable and schedule to implement specific remedial actions to be taken to address the recommendation in the Report, and the results thereof."

***h. 2014***

90. On November 11, 2014, the CFTC fined Citibank $310 million for impermissibly attempting to manipulate foreign exchange benchmark rates, expressly concluding that Citibank

"lacked adequate internal controls or procedures to detect and deter possible misconduct" involving the impermissible fixing of foreign exchange benchmark rates. Specifically, Citibank "failed to adequately assess the risks" that traders may attempt to fix the benchmark rates, "lacked adequate internal controls in order to prevent [] traders from engaging in improper communications" with traders at other banks, "lacked sufficient policies, procedures and training specifically governing participation in trading around the [foreign exchange] benchmark rates," and had "inadequate polices pertaining to, or insufficient oversight of, its [foreign exchange] traders' use of chat rooms or other electronic messaging." In addition to the $310 million fine, the CFTC required Citibank to "implement and improve its internal controls and procedures."

91. On the same day as the CFTC order, the OCC fined Citibank an additional $350 million and issued a Consent Order relating to Citibank's lack of internal controls over the bank's foreign exchange trading business. The OCC concluded that the "Bank had deficiencies in its internal controls . . . with respect to the oversight and governance of the Bank's [foreign exchange] [t]rading." Specifically, the OCC noted: (a) the "Bank's compliance risk assessment lacked sufficient granularity and failed to identify the risks related to market conduct"; (b) the "Bank's transaction monitoring and communications surveillance were inadequate"; (c) the "Bank's compliance testing procedures were inadequate to measure adherence to the Bank's standards of Employee conduct and firm policies"; and (d) the "Internal audit's risk assessment and coverage of [foreign exchange] [t]rating was inadequate to assess whether the Bank's control framework was effective."

92. The Consent Order also highlighted that the "Bank's internal controls surrounding benchmarks were previously criticized by the OCC in regard to the Bank's submissions in the LIBOR (London interbank offered rate) benchmark rate setting process." The OCC therefore

tasked the Citibank Board with ensuring that "the Bank achieves and thereafter maintains compliance with [the OCC's order]," and that "the Bank achieves and maintains effective controls, oversight and governance, monitoring and surveillance, compliance testing, and audit coverage related to Employee market conduct."

93. The Consent Order provided detailed instructions regarding what steps were necessary to comply for each category. To ensure ongoing Citibank Board involvement, the OCC's Order required that, at the end of each calendar quarter, the Compliance Committee "submit a written progress report to the Board setting forth in detail the actions taken to comply with each Article of this Order, and the results and status of those actions." The Citibank Board was then tasked with forwarding the report and any additional comments to the OCC.

94. On the same day, the FCA, one of the FSA's regulatory successors, levied an additional $358 million fine against Citibank in connection with the foreign exchange misconduct and issued a "Final Notice" finding that Citibank "fail[ed] to take reasonable care to organize and control its affairs responsibly and effectively with adequate risk management systems" in relation to foreign exchange trading in London. The FCA noted that the limited internal controls in place failed to recognize "obvious risks associated with confidentiality, conflicts of interest and trading conduct" and that "[t]he lack of proper control by Citi … meant that misconduct went undetected for a number of years."

95. Like its U.S. counterparts, the FCA also documented that Citibank was previously aware of potential misconduct in the foreign exchange trading because regulatory actions had been brought against other banks with regard to similar practices involving LIBOR. Nonetheless, Citibank failed to implement sufficient changes to its internal controls to ensure proper compliance.

96. On November 24, 2014, FINRA assessed a $15 million penalty against Citigroup Global Markets Inc. ("CGMI"), Citigroup's investment banking subsidiary. FINRA concluded that CGMI analysts provided non-public information to select customers in violation of securities laws. FINRA explicitly asserted in its Letter of Acceptance, Waiver and Consent that CGMI "failed to take adequate steps to supervise its equity research analysts' communications with clients to deter the selective dissemination of research." Even when CGMI detected instances of analysts selectively sharing information, "it failed to adequately enforce [its] policies and deter future violations." FINRA identified six previous disciplinary actions against CGMI that resulted in more than $438 million in fines levied against the investment bank. The previous regulatory actions penalized CGMI for failures to, *inter alia*, "adequately supervise the activities of research analysts," "establish and maintain a supervisory system reasonably designed to detect and prevent" disclosure violations, and "prevent or detect the written disclosure of material, nonpublic research information."

***i. 2015***

97. On May 20, 2015, Citicorp (the holding company for Citibank and certain other subsidiaries that sit below Citigroup) pleaded guilty to violating federal antitrust laws in connection with its traders' intentional manipulation of rates on the FX spot market. Citicorp's plea agreement specified that it had engaged in a "combination and conspiracy to fix, stabilize, maintain, increase or decrease the price of, and rig bids and offers for, the euro/U.S. dollar ('EUR/USD') currency pair exchanged in the foreign currency exchange spot market . . . in violation of the Sherman Antitrust Act, 15 U.S.C. § 1." Citicorp paid a $925 million criminal fine—the highest criminal fine imposed on any of the banks involved in FX manipulation—and was placed on probation for three years.

98. In addition, on May 20, 2015, the Federal Reserve fined Citigroup $342 million for failing to properly oversee its subsidiaries' foreign exchange trading compliance programs. The Federal Reserve's order explicitly found that "Citigroup lacked adequate firm-wide governance, risk management, compliance and audit policies and procedures" to properly oversee that its subsidiaries' foreign trading activities "complied with safe and sound banking practices." The Federal Reserve further found that "Citigroup's deficient policies and procedures prevented Citigroup from detecting and addressing [the] unsafe and unsound conduct." The Federal Reserve "conducted a supervisory review of the compliance and control infrastructure" and "identified areas for improvement." The Federal Reserve ordered that Citigroup "continue to implement additional improvements in its oversight, internal controls, compliance, risk management and audit programs" to comply with "safe and sound banking practices" and "applicable U.S. laws and regulations." The Order required the Board to submit a plan detailing methods "to improve senior management's oversight of Citigroup's compliance" and to submit enhanced written internal controls and compliance risk management programs relating to the foreign exchange trading practices. Furthermore, Citigroup was ordered to conduct annual tests of the internal controls and submit the results to the Federal Reserve. The Federal Reserve's Order also mandated that senior management report to Citigroup's Board "on the status and results of measures taken, or to be taken, to correct identified deficiencies and to comply with this Order and to ensure the ongoing efficacy of Citigroup's overall program."

99. On July 21, 2015, the CFPB issued a Consent Order against Citibank and two other Citigroup subsidiaries, finding that the bank violated numerous consumer protection laws in the sale of credit card add-on services. The CFPB concluded that Citibank and certain of its vendors employed deceptive marketing and billing tactics to sell credit card add-on services to customers

who did not ask for or require the products. Importantly, the Consent Order noted that Citibank's "compliance monitoring, vendor management, and quality assurance functions failed to prevent, identify, or correct" the improper sales conduct.

100. The CFPB required that the Citibank Board establish a three-member compliance committee to oversee the necessary changes to its credit-card sales program and reminded the Board that it had "the ultimate responsibility" for "ensuring [Citibank] complies with Federal consumer financial laws." The CFPB ordered Citibank to pay $700 million directly to consumers harmed by Citibank's improper sales practices and separately fined Citibank an additional $35 million to be paid directly to the CFPB.

101. On the same day, the OCC also issued a Consent Order against Citibank relating to the sale of credit card add-on services. The OCC's Order explicitly concluded that Citibank "failed to implement appropriate controls to ensure consumers provided informed and affirmative consent to purchase" the add-on products. The OCC fined Citibank an additional $35 million above the fine levied by the CFPB. The OCC mandated that Citibank make restitution to harmed customers but noted that restitution payments made by the bank will satisfy both the OCC's and CFPB's restitution requirements.

102. The Consent Order also mandated substantial reforms to the bank's internal controls. Specifically, the Order required new written policies regarding Citibank's managing of its third- party vendors, and the development of a "written enterprise-wide risk management program" for consumer optional add-on services. The risk management program required polices to "effectively manage, prevent, detect, and mitigate, on an on-going basis" the risks associated with employing unfair and deceptive practices, and called for the recording and monitoring of telephone calls and training of Citibank salespeople. The OCC required the Compliance

Committee to submit quarterly written progress reports to the Citibank Board setting forth "in detail" what actions the bank took to comply with the Order.

103. On July 22, 2015, the FDIC and the California Department of Business Oversight (the "CDBO") announced a joint $140 million civil monetary penalty assessed against Banamex USA for failing to comply with the previously issued 2012 Consent Order requiring increased board oversight over the anti-money laundering compliance program. The CDBO's press release announcing the fine—the then-largest fine ever assessed by the CDBO against a bank—represented that "[Banamex USA] agreed three years ago to correct numerous weaknesses in its anti-money laundering program" but "failed to do so" and the CDBO and the FDIC found "new, substantial violations of the BSA and anti-money laundering mandates over an extended period of time."

104. Indeed, despite the explicit directive in the 2012 Order requiring Banamex USA to "[e]stablish a system of internal controls to ensure compliance with the BSA … including policies and procedures to detect and monitor all transactions to identify suspicious or unusual activity," the FDIC concluded that the opposite was true, the bank failed to "maintain adequate internal controls reasonably designed to detect and report illicit financial transactions and other suspicious activities." Similarly, in complete disregard of the 2012 mandate, the FDIC found that the bank failed to "conduct effective independent testing."

***j. 2016***

105. On May 25, 2016, the CFTC issued two separate orders assessing a total of $425 million in fines against Citibank in connection with the bank's failure to submit accurate and proper metrics used in the calculation of benchmark interest rates. The CFTC fined Citibank and a number its subsidiaries $175 million for their attempted manipulation of the LIBOR and Euroyen

Tokyo Interbank Offered Rate ("Euroyen TIBOR") and for falsely reporting market information relating to those rates. The CFTC required Citibank to implement substantial additional internal controls to ensure that its submissions for the benchmark rates were accurate. The new internal controls required daily review of each of Citibank's daily submissions relating to the benchmark rates as well as the construction of additional "firewalls" between employees who submit the bank's interest rate submissions and traders who deal in products that rely on those rates. The CFTC also mandated that Citibank establish stronger monitoring and auditing of its submissions.

106. In addition, the CFTC fined Citibank $250 million for attempting to manipulate, and submitting false reports concerning, the U.S. Dollar International Swaps and Derivatives Association Fix ("USD ISDAFIX"), a global benchmark for interest rate products. The CFTC specifically found that "Citibank did not have specific internal controls or procedures, written or otherwise, regarding how USD ISDAFIX submissions should be determined or monitored." Furthermore, the CFTC found that the Bank's "ISDAFIX submitters received no formal training on making ISDAFIX submissions, and the Bank did not require submissions to be documented."

107. The CFTC ordered that Citibank "implement and improve its internal controls and procedures in a manner reasonably designed to ensure the integrity of the fixing of any interest-rate swap benchmark." The Order listed specific internal controls necessary to ensure compliance, including improvements to: (a) the measures designed to detect and deter improper communications; (b) the monitoring systems used to detect and deter manipulation of the swap rates; (c) the auditing process; and (d) the supervision over the trading desks that participate in the fixing of benchmarks based on interest-rate swaps.

***k. 2017***

108. On January 26, 2017, the SEC levied an $18.3 million fine against CGMI, concluding that the investment bank, in violation of the Investment Advisers Act, overbilled clients for more than fifteen years and had misplaced client contracts. This was true notwithstanding that CGMI was previously assessed hefty regulatory fines for violating securities laws, reflecting Citigroup's failure to ensure that the investment bank implemented policies and procedures to prevent further violations of law.

109. In the press release announcing the fine, the SEC represented that CGMI's misconduct occurred because "Citigroup failed to confirm the accuracy of billing rates entered into its computer systems in comparison to the fee rates outlined in client contracts" and "Citigroup failed to take the necessary precautions to ensure clients were billed in a manner consistent with their advisory agreements." The Order explicitly found that "CGMI failed to adopt and implement written policies and procedures reasonably designed to prevent the [] Advisers Act violations."

110. The SEC highlighted numerous deficiencies with CGMI's internal controls, including that the investment bank "failed to do sample testing of newly opened" accounts, "lacked adequate policies and procedures that would have required escalation of advisory fee billing errors," and "did not conduct any advisory fee testing or other type of compliance review to ensure that …[certain] rebates were issued." As a result, the SEC concluded that "CGMI willfully violated" the Investment Advisers Act provision requiring that a registered investment adviser adopt and implement written policies and procedures reasonably designed to prevent violations of the Advisers Act.

111. On May 18, 2017, the Money Laundering and Asset Recovery Section of the DOJ entered into a criminal non-prosecution agreement ("NPA") with Banamex USA and Citigroup

connected with the bank's anti-money laundering compliance failures, requiring forfeiture of more than $97 million, predicated upon numerous control deficiencies in Banamex USA's BSA/AML compliance program between 2007 and 2012 and Citigroup's apathy toward dealing with government regulators.

112. The DOJ applied only a "partial credit" for Banamex USA's cooperation during the investigation because the bank's "initial efforts to provide relevant facts and documents to the [DOJ] were neither timely nor substantial."

113. Moreover, the DOJ did not apply any "voluntary disclosure credit," because "neither [Banamex USA] nor Citigroup voluntarily and timely disclosed to the [DOJ] the conduct described" in the NPA. Furthermore, Citigroup was required to report directly to the DOJ "regarding remediation and implementation of compliance enhancements … in connection with BSA and money laundering compliance, including internal controls, policies, and procedures relating to Citigroup's oversight of BSA and money laundering compliance at its subsidiary financial institutions."

114. On December 12, 2017, the OCC fined Citibank an additional $70 million, concluding that Citibank failed to "achieve[] compliance" by failing to complete the corrective actions mandated by the OCC's 2012 Consent Order. Simply put, notwithstanding the quarterly reports provided to the Citibank Board and the Citigroup Board detailing the Company's progress—or lack thereof— in remediating its compliance deficiencies and remedial efforts, as required by the numerous prior agreements with and penalties imposed by the regulators, the bank remained non-compliant. In sum, just between 2012 and 2017 alone, more than $3.8 **billion** in monetary penalties were assessed against Citigroup for regulatory non-compliance, failed internal controls and lack of due oversight. The foregoing Orders and associated fines unquestionably put

Defendants on notice that Citigroup's internal controls and procedures were in urgent need of remediation.

***l. 2019***

115. On October 11, 2019, the OCC assessed a $30 million penalty and entered a Consent Order against Citibank for failure to fix long-standing violations of the statutory holding period for other real estate owned (OREO) in 12 U.S.C. § 29 and C.F.R. § 34.82. In this regard, in 2015 Citibank had committed to developing and implementing corrective actions to fix its "deficient processes and controls in the identification and monitoring" of the holding periods for OREO assets. Despite that commitment, the OCC notified the bank in April 2017 that "its internal controls governing OREO remained decentralized, ineffective, and inadequate."

116. The bank therefore "recommitted" to fixing its internal control problems by August 31, 2018. However, as a result of the Board's continuing failures to prioritize compliance, the bank again missed the 2018 deadline to overhaul its internal controls for OREO. Hence, the OCC's October 2019 Order found that Citibank had "engaged in repeated violations of the statutory holding period . . . including over 200 violations alone between April 4, 2017 and August 14, 2019," well after the date the bank promised the issues would be resolved. Indeed, the OCC found that these later "violations resulted from the Bank's deficient processes and controls in the identification and monitoring of the OREO holding period."

117. On November 26, 2019, the Bank of England's Prudential Regulatory Authority ("PRA") issued a Final Notice imposing a £43.9 million ($56.6 million) fine on Citigroup's United Kingdom operations because the Company continuously failed to submit complete and accurate regulatory returns to the PRA from June 2014 through December 31, 2018.

118. The regulatory filings were so inept that they failed to provide the PRA "with an accurate picture of [Citigroup's] capital or liquidity position" and "negatively impacted the PRA's ability to supervise Citi." In fact, the reporting errors were so extensive, the PRA concluded, that the "root" of the problem was the Company's lack of oversight. The press release announcing the fine specifically cautioned that "[t]he pervasiveness of the errors and misstatements identified in the firm's returns raised fundamental concerns about the effectiveness of Citi's UK regulatory reporting control framework."

119. The press release further explained that "Citi failed to deliver accurate returns and failed to meet the standards of governance and oversight of regulatory reporting which we expect of a systemically important bank." The PRA also found that the Company "failed to ensure that systems and controls supporting its UK regulatory reporting framework were designed, implemented and operating effectively" and that "Citi's oversight and governance in relation to regulatory reporting fell significantly below the standards expected of a systemically important institution."

120. The PRA Final Notice echoed the foregoing, representing that the "root cause" of the reporting errors was that Citigroup and its subsidiaries "failed to ensure that key systems and controls supporting their regulatory reporting framework were designed, implemented and operating effectively." Indeed, the Final Notice made clear that despite knowing of data quality issues since 2013, Citigroup failed to ensure "that adequate systems and controls were in place."

***m. 2020***

121. On January 17, 2020, the OCC entered a Consent Order imposing a $17,998,510 civil penalty in connection with Citibank's "pattern or practice of violations" regarding the Flood

Disaster Protection Act, as amended, ("Flood Act") (42 U.S.C. § 4012a(f)) and its implementing regulations, specifically 12 C.F.R. § 22.7(a).

122. Citibank used a third-party to service loans secured by homes and other buildings that are located in special flood hazard areas as collateral and relied on the third-party to force place appropriate flood insurance as required under the Flood Act. The OCC found that Citibank's Flood Act compliance program was deficient and resulted in the untimely force placement of flood insurance on certain loans, in violation of the Flood Act and its implementing regulations.

123. On September 24, 2020, the CFTC issued a Consent Order against Citibank, Citigroup Energy Inc. and CGMI, assessing a $4.5 million civil penalty in connection with internal control failures resulting in the deletion of millions of recordings Citibank was required to maintain.

124. Notably, some of the deleted recordings were responsive to a CFTC subpoena request, yet were deleted in October 2018, even after Citibank had assured the CFTC that they would be preserved and later produced. Citibank had used the same audio preservation system since 2001, and in 2014 had recognized that the system could not implement targeted legal holds for particular custodians and time periods.

125. Citibank therefore implemented a "stop-gap" measure to indefinitely preserve recordings for all users subject to regulatory retention requirements. This "stop-gap" measure ultimately became the permanent fix, yet internal memoranda from 2014 show that some Citibank employees knew the system would start to delete recordings when it ran out of storage space.

126. Moreover, an employee identified the "design flaw" that the system would automatically seek out and delete audio recordings when storage was limited. The employee

described this design flaw as a "ticking time bomb effect" because storage was limited and automatic deletions would inevitably occur.

127. In addition, the CFTC found that other important changes made to the preservation system were not properly documented, making it impossible for Citibank employees to recognize how the changes would affect the preservation of the recordings. This ultimately resulted in the deletion of recordings in October 2018, including recordings responsive to the CFTC subpoena request. The CFTC expressly found that "Citi did not maintain adequate internal controls with respect to its preservation of audio and thus failed to diligently supervise matters related to its business as a [CFTC] registrant." The CFTC further found that Citibank and other Citigroup subsidiaries "lacked adequate procedures to detect and elevate risks in the Audio Preservation System."

128. On August 11, 2020, what is perhaps the denouement of the Board's own doing – a chorus of Cassandra – played out in a colossal error resulting from years of inadequate internal controls and deficient oversight procedures, when the Company mistakenly paid $900 million of its own money to creditors of Revlon., exposing as false the Company's claims of implementing adequate and proper internal controls and procedures.

129. Citibank was serving as Revlon's agent for administering a loan extended to Revlon by certain hedge fund creditors. Although Citibank ostensibly intended to make only an interest payment due to the creditors on the loan, it actually paid back the full amount of principal and interest which Revlon owed on the loan. Naturally, most of the creditors who were already involved in a legal dispute with Citibank and Revlon concerning the Loan refused to return the mistakenly paid funds, correctly fearing that Revlon (which subsequently filed a bankruptcy

petition) lacked the ability to make payment. As a result, hundreds of millions of dollars of Company money flew out the door unchecked.

130. In the ensuing litigation between Citigroup and the Revlon creditors who refused to return the funds paid by the bank over and above the amount of interest owing, *In re Citibank August 11, 2020 Wire Transfers*, C.A. No. 1:20-cv-06539-JMF (S.D.N.Y.), Citigroup blamed the overpayment on human error, explaining in Court filings that "the individual who processed the payment mistakenly did not manually select the correct options and, unfortunately, the manual checks of that selection failed to detect the mistake." Citibank's own Global Head of Loan and Credit Risk Services Operations, Brendan Zeigon, however, testified that **Citibank lacked any internal controls that would have caught the mistaken $900 million payment and prevented it**.

131. Furthermore, Counsel for the creditors countered Citigroup's contentions by convincingly arguing that the recipients had a reasonable belief that the money was paid intentionally rather than as an "utterly apparent mistake," and that they therefore had the right to retain the funds. A vice president for HPS Investment Partners, LLC, one of the recipients, testified that he assumed the money was intentionally paid because he "worked in the operations of financial institutions for 17 years and [understood] that sophisticated financial institutions such as Citibank have many levels of internal controls in place to prevent issuing wire payments by mistake" and that a mistake of that magnitude would not be "possible given the extensive internal controls that I presume a sophisticated financial institution like Citibank would have."

132. A representative for another recipient, Brigade Capital Management, LP ("Brigade"), echoed the foregoing testimony, asserting that "I knew that Citibank is one of the largest, most sophisticated financial institutions in the world. As such, I presumed Citibank has

many levels of internal controls in place to prevent mistaken payments, particularly mistaken payments of funds from Citibank's own balance sheet."

133. In addition, the recipients presented expert testimony that "it is virtually inconceivable that the Citi loan processing would simply send wires in the amount of the [$900 million payment] based on a single clerk 'checking a box' (or failing to check a box)."

134. As one Bloomberg columnist astutely observed: "When a simple human lapse like this can cause such a problem, it suggests there may be systemic deficiencies too. Where were the checks?" In another report, titled "*Citi's $25 Billion Reasons to Fix Repeat Control Failures*," Bloomberg chastised Citigroup for ignoring repeated compliance issues raised in the bank's "long history of regulatory troubles." The article noted **"[w]hen there are warnings that you don't have the right resources, don't be surprised when issues result if you choose to ignore them**." (Emphasis added).

135. On September 10, 2020, the Company announced that Corbat would be retiring in February 2021—much earlier than had previously been expected—and that he would be replaced as CEO by Fraser.

136. On September 14, 2020, *The Wall Street Journal* reported that federal regulators were preparing new fines to address the Company's continued compliance failures. In response to that news, the Company publicly acknowledged that its "risk and control environment" was "not yet where we need to be and that has to change." **It further admitted that the Company's accidental $900 million payment resulted from "unacceptable" control failures**.

137. On October 7, 2020, the OCC and Federal Reserve imposed a $400 million fine on the Company and issued new coordinated Orders finding that **major deficiencies with the Company's enterprise-wide risk-management and internal controls, which had been the**

**subject of past regulatory actions, still had not been remediated**. Reflecting their respective zones of regulatory authority, the OCC's Orders were issued against Citibank, while the Federal Reserve's Order was issued against Citigroup as a whole. The new Orders confirmed that the Board failed to prioritize necessary reforms, that the Company failed to implement or maintain enterprise-wide internal controls and risk-management systems, and that, as a result, the Company remained in violation of several past governmental Orders. The new Orders revealed the scale of the Board's failure to prioritize reforms and take compliance seriously.

138. More specifically, the October 7, 2020, Federal Reserve Cease and Desist Order, which was agreed to by the Citigroup Board, represents that the Federal Reserve "identified significant ongoing deficiencies in implementation and execution by Citigroup with respect to various areas of risk management and internal controls, including for data quality management and regulatory reporting, compliance risk management, capital planning, and liquidity risk management." The Order found that Citigroup failed to take "prompt and effective actions to correct practices previously identified by [the Federal Reserve]." Because the responsibility for necessary reforms was squarely on the Board's shoulders in prior Orders, mandating that the Board issue progress reports detailing Citigroup's efforts to achieve compliance, removing all question that the Board was undeniably aware of the need to prioritize reforms but failed to do so, the Federal Reserve's Order expressly noted that "**Citigroup has not adequately remediated the long-standing enterprise-wide risk management and controls deficiencies previously identified by the Federal Reserve**, including … those addressed in (i) the Consent Order issued by the [Federal Reserve] on March 21, 2013 to remediate outstanding deficiencies in Citigroup's anti-money laundering compliance program and (ii) the Consent Order issued by the [Federal Reserve] on May 20, 2015 to remediate outstanding deficiencies in Citigroup's compliance and

control infrastructure relating to its foreign exchange program and designated market activities."[5] (Emphasis added)

139. The Federal Reserve Cease and Desist Order once again specifically required the Board to submit a plan to the Federal Reserve, including:

> • "actions that the board of directors will take to hold senior management accountable for executing effective and sustainable remediation plans by committed deadlines;"
>
> • "actions [that] the board of directors will take to ensure senior management improves, and thereafter maintains, effective and independent enterprise-wide risk management, and that internal audit findings are effectively remediated;"
>
> • "actions that the board of directors will take to ensure that senior management incentive compensation is consistent with risk management objectives and measurement standards;" and
>
> • "actions that the board of directors will take to ensure effective reporting to the board of directors that will enable it to oversee management's execution of the matters identified in this Order."

140. The OCC on the very same day issued two carefully worded Consent Orders against Citibank that were agreed to by the Citibank Board. The first Order imposes a monetary penalty, and the second requires severe governance changes. Both expressly found—and **Citibank agreed not to deny—that: "For several years, the Bank has failed to implement and maintain an enterprise-wide risk management and compliance risk management program, internal controls, or a data governance program commensurate with the Bank's size, complexity, and risk profile," noting that these were "serious and longstanding deficiencies."** The OCC found further that—despite the Company's years of control failures and resulting fines and the Board's undeniable knowledge of the Company's compliance problems—the Board still had failed to

[5] In fact, several of the Board's current members (Defendants Hennes, Henry, Reiner, Taylor, and Turley) were already elected to the Board at the time of the 2015 Federal Reserve Order or served as managers responsible for implementing elements of the 2013 and 2015 Orders.

remedy voluminous "deficiencies, noncompliance with 12 C.F.R. Part 30, Appendix D, … [and] unsafe or unsound practices with respect to the Bank's enterprise-wide risk management and compliance risk management program," including:

> • "failure to establish effective front-line units and independent risk management as required by 12 C.F.R. Part 30, Appendix D;"
>
> • "failure to establish an effective risk governance framework as required by 12 C.F.R. Part 30, Appendix D;"
>
> • "failure of the Bank's enterprise-wide risk management policies, standards, and frameworks to adequately identify, measure, monitor, and control risks;" and
>
> • "failure of compensation and performance management programs to incentivize effective risk management."

141. The OCC also "identified unsafe or unsound practices with respect to the Bank's internal controls, including, among other things, an absence of clearly defined roles and responsibilities and noncompliance with multiple laws and regulations." The OCC further identified numerous "deficiencies, noncompliance with 12 C.F.R. Part 30, Appendix D, or unsafe or unsound practices with respect to the Bank's data quality and data governance, including risk data aggregation and management and regulatory reporting," including:

> • "failure to establish effective front-line units, independent risk management, internal audit, and control functions as required by 12 C.F.R. Part 30, Appendix D;"
>
> • "inability to develop and execute on a comprehensive plan to address data governance deficiencies, including data quality errors and failure to produce timely and accurate management and regulatory reporting;" and
>
> • "inadequate reporting to the Board on the status of data quality and progress in remediating identified deficiencies."

142. The OCC specifically placed blame for Citibank's persistent failure to achieve compliance on the Citibank Board and its reporting systems, representing that the "**Board and senior management oversight is inadequate to ensure timely, appropriate actions to correct**

**the serious and longstanding deficiencies and unsafe or unsound practices in the areas of risk management, internal controls, and data governance at the bank**. Furthermore, inadequate reporting to the Board hinders its ability to provide effective oversight." (Emphasis added) Hence, the Citibank Board's inadequate reporting of the status of data quality and progress in remediating identified deficiencies confirms that the Board's failure to exercise reasonable oversight was both sustained and systemic.

143. Accordingly, the OCC issued a **$400 million penalty** to Citibank and required Citibank to agree to numerous remedial measures, including: (i) forming a new board-level Compliance Committee; (ii) developing a comprehensive action plan for achieving compliance; (iii) implementing an appropriate and detailed data governance program; (iv) implementing an appropriate and detailed enterprise-wide risk management program; (v) implementing an appropriate and detailed compliance risk management program; (vi) improving the bank's capital planning processes; (vii) and improving the bank's internal controls. The Order also imposed a new requirement for Citibank to seek OCC approval before making any significant new acquisitions. As a Bloomberg commentator explained, this requirement is likely a direct result of "Citibank's inability to properly integrate new acquisitions into its expansive network" that contributed to many of the underlying problems in the first place.

144. The OCC's October 2020 Order squarely places responsibility for compliance on the shoulders of the Citibank Board, stating: "The Board shall ensure that the Bank has timely adopted and implemented all corrective actions required by this Order, and shall verify that the Bank adheres to the corrective actions and they are effective in addressing the Bank's deficiencies that resulted in this Order." The Order also allows the OCC to make changes to Citibank's

management or Board membership if it determines that the Board and management are not performing adequately.

***n. 2021***

145. On February 16, 2021, the judge in *In re Citibank August 11, 2020 Wire Transfers*, C.A. No. 1:20-cv-06539-JMF (S.D.N.Y.), issued a decision **denying** Citigroup's demand to claw back the hundreds of millions of dollars it mistakenly paid out of its own pocket to Revlon lenders. Judge Furman agreed with the lenders that they "believed, and were justified in believing, that the payments were intentional." According to the decision, Citi's mistake was "one of the biggest blunders in banking history," and "there is no doubt that the party best positioned to avoid the error that occurred was Citibank."

**C. Citigroup's SEC filing And Shareholder <u>Communications Were Materially False And Misleading</u>**

146. It is now clear as day that Citigroup's annual Proxy Statements filed with the SEC on March 14, 2018, March 6, 2019, March 11, 2020, March 17, 2021, and March 15, 2022 in advance of the respective annual election of directors, were riddled with materially misleading misrepresentations regarding the Company's oversight and risk management practices by virtue of their failures to disclose that Citigroup did not implement and maintain an effective system of internal controls and procedures, contrary to the repeated findings and warnings of the specified regulatory entities detailed above.

147. In fact, the Company's annual Proxy Statement filed with the SEC on March 14, 2018 (the "2018 Proxy"), misrepresented that:

> • "[The Company] continually strives to maintain the highest standards of ethical conduct: reporting results with accuracy and transparency and maintaining full compliance with the laws, rules, and regulations that govern Citi's businesses. Citi is active in ensuring its governance practices are at the leading edge of best practices."

• "the Board oversees Citi's global risk management framework."

• "The Board is responsible for shaping corporate governance policies and practices, including adopting the corporate governance guidelines applicable to the Company and monitoring the Company's compliance with governance policies and the guidelines."

• "Citi must be able to access reliable data to ensure that it complies with regulatory requirements including anti-money laundering and sanctions, and to meet other information security and control objectives."

• "Having Directors with experience interacting with regulators or operating businesses subject to extensive regulation is important to furthering Citi's continued compliance with its many regulatory requirements."

• "Directors provide oversight of the Company's risk management framework, including the significant policies, procedures, and practices used in managing credit, market, and certain other risks, including liquidity, capital, and balance sheet risks, as well as capital markets risks, and review recommendations by management regarding risk mitigation."

• "We foster a culture of ethics through our governance framework, programs and efforts that embed our culture and expectations for behavior throughout the organization, and collaboration with key stakeholders outside Citi to improve Citi's and the banking industry's culture."

148. The foregoing representations in the 2018 Proxy were materially false and misleading inasmuch as they conveyed that the Board: (i) maintained sufficient compliance, risk controls, review, and reporting programs to identify and address misconduct; (ii) was unaware of existing undisclosed material legal and compliance risks that could affect the Company; and (iii) had policies to and, in fact, did implement adequate internal controls. In truth, however, the 2018 Proxy omitted the following disclosures, which were necessary in order for the statements that were made not to be misleading: (i) Citigroup had ineffective internal and regulatory compliance controls; (ii) the Board failed to comply with commitments made to regulators to resolve many enforcement proceedings since 2013; and (iii) the Board failed to take appropriate steps to address

Citigroup's inadequate internal controls, even after years of red flags alerting the Board to the unsafe, unlawful and improper behavior.

149. The 2018 Proxy also harmed Citigroup and its shareholders by soliciting and obtaining shareholder approval of the Citigroup 2018 Stock Incentive Plan under false pretenses, resulting in millions of dollars in equity compensation paid to wrongdoers. As a result of the materially false or misleading statements in the 2018 Proxy, Citigroup stockholders voted to approve the 2018 Stock Incentive Plan.

150. Similarly, the Company's annual Proxy Statement filed with the SEC on March 6, 2019 (the "2019 Proxy") misrepresented that:

> • "Management also made progress on the regulatory front last year, which we believe is critical to the firm's success."
>
> • "The Board and our Risk Committee engage deeply in the oversight of risk management practices in these and other areas, always recognizing that, while Citi is in the business of taking risk, these risks must be understood, measured, monitored, and controlled."
>
> • "Citi is active in ensuring its governance practices are at the leading edge of best practices."
>
> • "Citi's Board has an important oversight function with respect to compliance with applicable requirements."
>
> • "Citi must be able to access reliable data to ensure that it complies with regulatory requirements, including anti-money laundering and sanctions, and to meet other information security and control objectives."
>
> • "Having Directors with experience interacting with regulators or operating businesses subject to extensive regulation is important to furthering Citi's continued compliance with its many regulatory requirements and fostering productive relationships with its regulators."
>
> • "Directors provide oversight of the Company's risk management framework."

> • "The Risk Management Committee enhances the Board's oversight of risk management. The Committee's role is one of oversight, recognizing that management is responsible for executing Citi's risk management policies."
>
> • "We foster a culture of ethics through our governance framework, programs and efforts that embed our culture and expectations for behavior throughout the organization, and collaboration with key stakeholders outside Citi to improve Citi's and the banking industry's culture."

151. The foregoing representations in the 2019 Proxy were materially false and misleading inasmuch as they conveyed that the Board: (i) maintained sufficient compliance, risk controls, review, and reporting programs to identify and address misconduct; (ii) was unaware of existing undisclosed material legal and compliance risks that could affect the Company; and (iii) had policies to implement adequate internal controls. In truth, however, the 2019 Proxy omitted the following disclosures, which were necessary in order for the statements that were made not to be misleading: (i) Citigroup's ineffective internal and regulatory compliance controls; (ii) the Board's failure to comply with commitments made to federal regulators to resolve enforcement proceedings since 2013; and (iii) the failure to take appropriate steps to address the inadequate internal controls, even after years of red flags alerting them to the improper behavior.

152. The 2019 Proxy also harmed Citigroup and its shareholders by soliciting and obtaining shareholder approval of the Citigroup 2019 Stock Incentive Plan under false pretenses, resulting in millions of dollars in equity compensation paid to wrongdoers. As a result of the materially false or misleading statements in the 2019 Proxy, Citigroup stockholders voted to approve 2019 Stock Incentive Plan.

153. Furthermore, the Company's annual Proxy Statement filed with the SEC on March 11, 2020 (the "2020 Proxy") misrepresented that:

> • "the Board remains deeply focused on Citi making substantial progress towards the termination of outstanding enforcement orders and on other remediation

projects, recognizing and expecting that this progress will continue to require a substantial commitment of time and resources by both management and the Board."

• "Citi is active in ensuring its governance practices are at the leading edge of best practices."

• "As part of the self-evaluation, the Board engages in an examination of its own performance of its obligations with regard to such matters as regulatory requirements, strategic and financial oversight, oversight of risk management, executive compensation, succession planning, and governance, among many other topics."

• "Citi's Board has an important oversight function with respect to compliance with applicable requirements."

• "Citi must be able to access reliable data to ensure that it complies with regulatory requirements, including anti-money laundering and sanctions, and to meet other information security and control objectives."

• "Having Directors with experience interacting with regulators or operating businesses subject to extensive regulation is important to furthering Citi's continued compliance with its many regulatory requirements and fostering productive relationships with its regulators."

• "Directors provide oversight of the Company's risk management framework, including the significant policies, procedures, and practices used in managing credit, market, and certain other risks, including liquidity, capital, and balance sheet risks, as well as capital markets risks, and review recommendations by management regarding risk mitigation."

• "The Risk Management Committee enhances the Board's oversight of risk management. The Committee's role is one of oversight, recognizing that management is responsible for executing Citi's risk management policies."

• "We foster a culture of ethics through our governance framework, programs and efforts that embed our culture and expectations for behavior throughout the organization, and collaboration with key stakeholders outside Citi to improve Citi's and the banking industry's culture."

154. The foregoing representations in the 2020 Proxy were materially false and misleading inasmuch as they conveyed that the Board: (i) maintained sufficient compliance, risk controls, review, and reporting programs to identify and address misconduct; (ii) was unaware of existing undisclosed material legal and compliance risks that could affect the Company; and (iii)

had policies to and did implement adequate internal controls. In truth, however, the 2020 Proxy omitted the following disclosures, which were necessary in order for the statements that were made not to be misleading: (i) Citigroup had ineffective internal and regulatory compliance controls, as repeatedly found by its regulators; (ii) the Board repeatedly failed to comply with commitments made to federal regulators to resolve enforcement proceedings since 2013; and (iii) the Board failed to take appropriate steps to address Citigroup's inadequate internal controls, even after years of red flags alerting them to the improper behavior.

155. The 2020 Proxy also harmed Citigroup and its shareholders by soliciting and obtaining shareholder approval for the Citigroup 2020 Stock Incentive Plan under false pretenses, resulting in millions of dollars in equity compensation paid to wrongdoers and Citigroup increasing the number of shares authorized for grants under the plan by 15 million. As a result of the materially false or misleading statements in the 2020 Proxy, Citigroup stockholders voted to approve 2020 Stock Incentive Plan.

156. In addition, the Company's annual Proxy Statement filed with the SEC on March 17, 2021 (the "2021 Proxy") misrepresented that:

> • "Citi is active in ensuring its governance practices are at the leading edge of best practices."
>
> • "As part of the self-evaluation, the Board engages in an examination of its own performance of its obligations with regard to such matters as regulatory requirements, strategic and financial oversight, oversight of risk management, executive compensation, succession planning, and governance, among many other topics."
>
> • "Citi's Board has an important oversight function with respect to compliance with applicable requirements."
>
> • "Having Directors with experience interacting with regulators or operating businesses subject to extensive regulation is important to furthering Citi's continued compliance with its many regulatory requirements and fostering productive relationships with its regulators."

• "Directors provide oversight of the Company's risk management framework, including the significant policies, procedures, and practices used in managing credit, market, and certain other risks, including liquidity, capital, and balance sheet risks, as well as capital markets risks, and review recommendations by management regarding risk mitigation."

• "The Risk Management Committee enhances the Board's oversight of risk management. The Committee's role is one of oversight, recognizing that management is responsible for executing Citi's risk management policies."

• "We foster a culture of ethics through our governance framework, programs and efforts that embed our culture and expectations for behavior throughout the organization, and collaboration with key stakeholders outside Citi to improve Citi's and the banking industry's culture."

157. Notwithstanding acknowledgement of the "$400 million civil money penalty in the third quarter of 2020 in connection with the Consent Order entered into with the OCC," the 2021 Proxy was materially false and misleading inasmuch as it conveyed that the Board: (i) maintained sufficient compliance, risk controls, review, and reporting programs to identify and address misconduct; and (ii) had policies to and did implement adequate internal controls. In truth, however, the 2021 Proxy omitted the following disclosures, which were necessary in order for the statements that were made not to be misleading: (i) the Board's failure to comply with commitments made to federal regulators to resolve enforcement proceedings since 2013; and (ii) the failure to take appropriate steps to address Citigroup's inadequate internal controls, even after years of red flags alerting the Board thereto.

158. The 2021 Proxy also harmed Citigroup by soliciting and obtaining shareholder approval for the amendment to the Citigroup 2019 Stock Incentive Plan increasing the number of authorized shares, as described in Proposal 4, resulting in millions of dollars in equity compensation paid to wrongdoers. As a result of the materially false or misleading statements in

the 2021 Proxy, Citigroup stockholders voted to approve the amendment to Citigroup 2019 Stock Incentive Plan.

159. Finally, the Company's annual Proxy Statement filed with the SEC on March 15, 2022 (the "2022 Proxy") misrepresented that:

> • "Citi is active in ensuring its governance practices are at the leading edge of best practices."
>
> • "As part of the self-evaluation, the Board engages in an examination of its own performance of its obligations with regard to such matters as regulatory requirements, strategic and financial oversight, oversight of risk management, executive compensation, succession planning, and governance, among many other topics."
>
> • "Citi's Board has an important oversight function with respect to compliance with applicable requirements."
>
> • "Having Directors with experience interacting with regulators or operating businesses subject to extensive regulation is important to furthering Citi's continued compliance with its many regulatory requirements and fostering productive relationships with its regulators."
>
> • "Directors provide oversight of the Company's risk management framework, including the significant policies, procedures, and practices used in managing credit, market, and certain other risks, including liquidity, capital, and balance sheet risks, as well as capital markets risks, and review recommendations by management regarding risk mitigation."
>
> • "The Risk Management Committee enhances the Board's oversight of risk management. The Committee's role is one of oversight, recognizing that management is responsible for executing Citi's risk management policies."
>
> • "We foster a culture of ethics through our governance framework, programs and efforts that embed our culture and expectations for behavior throughout the organization, and collaboration with key stakeholders outside Citi to improve Citi's and the banking industry's culture."

160. In the 2022 Proxy Statement, the Company further represented that it and the Board "are focused on meeting the expectations of our regulators as reflected in the Consent Orders we entered into with the Federal Reserve Board and the Office of the Comptroller of the Currency

(OCC) in October 2020 (Consent Orders). In support of these efforts, in 2021 we increased staffing in our risk, audit and compliance functions and other relevant areas, and we continued to make enhancements to our compensation process to ensure the strongest possible link between performance and pay, address the issues raised by regulators and provide transparency to investors."

161. The 2022 Proxy was materially false and misleading inasmuch as it conveyed that the Board: (i) maintained sufficient compliance, risk controls, review, and reporting programs to identify and address misconduct; and (ii) had policies to and did implement adequate internal controls. In truth, however, the 2022 Proxy omitted the following disclosures, which were necessary in order for the statements that were made not to be misleading: (i) the Board's failure to comply with commitments made to federal regulators to resolve enforcement proceedings since 2013; and (iii) the failure to take appropriate steps to address Citigroup's inadequate internal controls, even after years of red flags alerting the Board to the improper behavior.

162. The 2022 Proxy also harmed Citigroup by soliciting and obtaining shareholder approval for the amendment to the Citigroup 2019 Stock Incentive Plan under false pretenses, increasing the number of authorized shares, as described in Proposal 4, thereby resulting in millions of dollars in equity compensation paid to wrongdoers. As a result of the materially false or misleading statements in the 2021 Proxy, Citigroup stockholders voted to approve the amendment to the Citigroup 2019 Stock Incentive Plan.

## D. <u>The Alleged Misconduct Violated Existing Company Policies</u>

163. The foregoing misconduct also violates the Company's Code of Conduct (the "Code of Conduct"), which requires that the Board direct, oversee, and "maintain processes and controls to govern the use, transmission, sharing, storage, disclosure, transfer, security, accuracy, and access to client and employee information globally." As part of the Code of Conduct, adopted

by the Company's Board of Directors and applicable to every director, officer, and employee of Citigroup and its consolidated subsidiaries, each of the members of the Board has and had the responsibility to adhere to the following, among other, rules and guidelines:

> • Understand and comply with the laws, regulations, and Citi policies and procedures that govern your business, region, and/or function.
>
> • Conduct business in a manner that is fair, transparent, prudent, and dependable. This includes a commitment to honesty in our dealings and communications with our clients, suppliers, competitors, and each other.
>
> • **Doing Business Fairly and Honestly** - We create economic value for our clients, transform our business, and shape our future through our ingenuity and leadership – not through inappropriate or unfair conduct in the marketplace.
>
> • **Fair Treatment** - We are committed to dealing fairly and honestly with our clients, suppliers, distributors, competitors, and employees. To treat all our business partners fairly, you must: Not engage in manipulation, concealment, abuse of confidential information, misrepresentation of material facts, or other unfair dealings or practices.
>
> • **Anti-Money Laundering (AML)** - We are committed to preventing the use of our products or systems to launder criminal proceeds, to finance terrorism, to evade taxation, or to bypass applicable sanctions laws. . . . To combat money laundering, terrorist financing, and tax evasion, you must: • Know and follow the requirements set forth in the Global Anti-Money Laundering Policy, the Global AM, Know Your Customer (KYC) Policy, and related policies, procedures, and controls • Complete AML training upon employment with Citi and regularly thereafter. If your job responsibilities require more detailed knowledge of anti-money laundering or counter-terrorist financing, tax evasion, or tax evasion facilitation, speak to your manager to obtain necessary training. • Apply the appropriate level of due diligence when entering into client relationships and, where applicable, individual transactions. No client relationship is worth compromising our commitment to combating money laundering, terrorist financing, tax evasion, and other crimes. • Escalate unusual or suspicious activity according to the procedures of your business, region, and/or function. • Understand and follow the AML and suspicious activity reporting procedures for your business region, and/ or function, particularly when dealing with clients, transactions, or financial records. • Never advise a client, or anyone outside of Citi, that an account is or has been subject to review for AML purposes without first consulting Legal.

164. Furthermore, as indicated above, the misconduct violates Citigroup's Corporate Governance Guidelines, which state, in part:

> Citigroup Inc. ("Citi") aspires to the highest standards of corporate governance and ethical conduct: doing what we say; reporting results with accuracy and transparency; and maintaining full compliance with the laws, rules and regulations that govern Citi's businesses.
>
> * * *
>
> [Directors must] exhibit [] behavior that indicates he or she is committed to the highest ethical standards.

165. In addition, as indicated above, the misconduct also violates Citigroup's Audit Committee Charter, which states, in part, that the Audit Committee:

> Review with management its evaluation of Citigroup's internal control structure and procedures for financial reporting and review periodically, but in no event less frequently than quarterly, management's conclusions about the efficacy of such internal controls and procedures, including any significant deficiencies or material weaknesses in such controls and procedures.
>
> Annually review and discuss with management and the Independent Auditors (1) management's assessment of the effectiveness of Citigroup's internal control structure and procedures for financial reporting and (2) the Independent Auditors' report on the effectiveness of Citigroup's internal control over financial reporting related to Section 404 of the Sarbanes-Oxley Act of 2002.
>
> Review and discuss with management, at least annually, the effectiveness of the Company's anti-money laundering compliance program (the "AML Program").
>
> Review with management Citi's Global Sanctions Policy and the Sanctions Risk Appetite Statement and approve the Policy and Statement and any material changes thereto.
>
> Review periodically with management, including the Citigroup Chief Risk Officer, the Chief Compliance Officer and the General Counsel, and the Independent Auditors, any significant correspondence with, or other action by, regulators or governmental agencies, any material legal affairs of Citigroup and Citigroup's compliance with applicable law and listing standards.
>
> Receive regular reports on the schedule and results of significant regulatory examinations in the United States and abroad, including the nature and status of corrective actions.
>
> Receive regular reports on significant issues that potentially create regulatory attention, including briefings on business decisions or significant issues that arise

> in areas on which the regulators are focused or that otherwise generate regulatory scrutiny or actions.
>
> Oversee and receive reports on ongoing regulatory projects, including regular updates on significant long-term projects being implemented in response to particular regulatory issues or concerns, except to the extent another Committee of the Board receives reports on specific regulatory projects.
>
> Receive periodic briefings on the key controls and processes in specific business or functional areas, in particular with respect to areas that are the subject of regulatory concern.
>
> Receive periodic briefings on existing or proposed regulations in the United States and abroad that could significantly impact Citigroup's business activities, including periodic briefings on the nature of the regulatory environment in the United States and abroad.
>
> Review and discuss with management the strategy for and status of Citigroup's key regulatory relationships in the United States and abroad.
>
> Review whether senior management has established appropriate incentives to integrate compliance objectives into the management goals, performance reviews and compensation structure across Citigroup, and those appropriate actions and other measures are taken when compliance failures are identified, including disciplinary actions for serious compliance failures.
>
> Annually review and approve management's evaluation of the effectiveness of Citigroup's systems and processes used to calculate risk-based capital requirements.
>
> Receive and discuss reports from management on an annual and as needed basis relating to: significant reported ethics violations; compliance with regulatory internal control and compliance reporting requirements.

166. Finally, the misconduct also violated the Company's Ethics, Conduct and Culture Committee Charter, which states in part:

> Review and assess Citi's strategy, communications, and policies relating to sound ethics, responsible conduct and principled culture to determine if further enhancements are needed to align with the desired culture and to foster ethical decision-making by employees.
>
> Oversee Management's efforts to support ethical decision-making in the organization, evaluate Management's progress, and provide feedback on these efforts.

> Review and assess the adequacy at least annually of Citi's Code of Conduct and recommend any proposed changes or waivers to the Board for approval.
>
> Review and assess the adequacy at least annually of Citi's Ethics Code for Financial Professionals and approve any changes.
>
> Provide oversight over Citi's Conduct Risk Management Program, whose objective, under Citi's Conduct Risk Policy, is to enhance Citi's culture of compliance and control through the management, minimization, and mitigation of Citi's conduct risks.

## E. Citigroup's Directors and Officers Played a Critical Role in the Scheme

167. On March 19, 2013, Citigroup's Board adopted a resolution authorizing entry into the March 21, 2013, Consent Order. Corbat was a member of the Board at the time of the March 21, 2013, Consent Order and was obligated, by its terms, to "fully utilize Citigroup's financial and managerial resources … to ensure that each of the Banks complies with the Consent Orders by their respective banking agency supervisors and any other supervisory actions taken by their respective banking agency supervisors." In addition, Desoer and Fraser, then officers of Citibank and current directors of Citigroup, were obligated to implement reforms as part of the March 21, 2013, Consent Order.

168. Corbat, Hennes, Reiner, Taylor, and Turley were members of the Board at the time the May 20, 2015, Consent Order and Henry had been elected to the Board (his term began on July 1, 2015) and were thus obligated to take steps to ensure compliance with the Consent Order. Also, Corbat, Desoer, and Fraser were members of Citigroup's Operating Committee and officers of Citibank and were obligated to implement reforms in connection with the May 20, 2015 Consent Order.

## F. Citigroup and Many Individual Defendants Are Sued In The Securities Class Action

169. In October 2020, the Company and certain of its officers and directors were named defendants in three putative class action complaints filed in the United States District Court for the

Southern District of New York on behalf of purchasers of Citigroup securities between February 25, 2017 and October 12, 2020, inclusive (the "Class Period"). The actions were consolidated under the caption *In re Citigroup Sec. Litig.*, No. 1:20-CV-9132 (S.D.N.Y.). The consolidated complaint names Defendants Costello, Dailey, Desoer, Dugan, Hennes, Henry, Ireland, James, and Turley, among others, as defendants.

170. In the Consolidated Complaint, the Lead Plaintiffs in the Securities Class Action allege that throughout the Class Period, Citigroup and the named defendants therein materially misrepresented (and omitted to state information necessary to make the statements made not misleading) Citigroup's internal controls during the Class Period in violation of Sections 10(b) and 20(a) of the Securities Exchange Act of 1934. Defendants moved to dismiss the consolidated amended complaint, which motion remains pending.

171. Citigroup has incurred substantial costs defending itself, and its directors and officers in the Securities Class Action. Citigroup will incur further defense costs and will be subjected to further material costs in resolving the action or if found by a jury to have committed securities fraud.

## G. <u>Citigroup has Suffered Material Harm as a Result of the Misconduct Described Herein</u>

172. Citigroup's colossal failures have visited disastrous consequences on the Company. The Company has incurred a new $400 million fine—adding to the billions of dollars the Company has paid regulators for its compliance failures in recent years. Furthermore, the OCC's Order requires that "[w]ith the exception of ordinary course transactions, such as hedging, market making, and securitization transactions . . . the Bank shall not complete any new portfolio or business acquisitions until it has received prior written determination of no supervisory objection to the review process from the Deputy Comptroller." That means that Citibank cannot open new

retail bank branches, acquire other banks, or increase its already massive derivatives book (other than hedging) without the express consent of the OCC.

173. Moreover, according to a report published on October 13, 2020, by an analyst for Deutsche Bank: "We now assume a $3b increase in related costs in 2022 vs. 2019, with about $1b already disclosed" will be suffered as a financial matter. On December 9, 2020, Citigroup's CFO indicated that the remediation efforts may exceed $1.5 billion in 2021 alone. In addition, the Company's mistaken payment of $900 million of its own money to Revlon creditors is expected to result in additional costs to the Company, including from the litigation arising from that payment under the caption *In re Citibank August 11, 2020 Wire Transfers*, C.A. No. 1:20-cv-06539-JMF (S.D.N.Y.), in which the judge ruled that $500 million need not be returned by the recipients.

174. Furthermore, the Company's reputation has been seriously tarnished and has resulted in the destruction of billions of dollars of corporate equity. Citigroup's stock dropped more than 15% in the days following the mid-September report of impending regulatory action—representing a market capitalization loss of well over $16 billion.

175. Last but not least, the Company also faces significant additional liability in connection with its being named as a defendant in a securities fraud class action filed in this Court seeking to hold the Company liable for $17.43 billion in shareholder losses. *City of Sunrise Firefighters' Pension Fund v. Citigroup, Inc., et al.*, Case No. 1:20-cv-09132 (S.D.N.Y). The parties have fully briefed the defendants' motions to dismiss the amended complaint and the motion is *sub judice*.

176. The Company has incurred and will continue to incur substantial costs defending itself against the foregoing lawsuit and securities class action. Even if the Company ultimately prevails, Citigroup has already suffered substantial financial and reputational harm.

177. In addition, the Company has also suffered significant damage to its reputation as a result of the Individual Defendants' misconduct.

**H. <u>Plaintiffs' Demand</u>**

178. By letter to the Citigroup Board of Directors dated February 18, 2021 (the "Demand Letter," attached as Exhibit A), Plaintiffs Lipshutz and Jeweltex, who acquired Citigroup stock in or before October 2009 and have held Citigroup stock continuously since that time, demanded that the Board undertake specific action to recover the Company's damages from the culpable parties. They further demanded that the Board take all necessary steps to install adequate compliance and internal control systems and effective corporate governance practices and procedures to prevent such misconduct and damages from occurring in the future.

179. On June 17, 2021, Plaintiffs' counsel received a letter written on behalf of the Board acknowledging receipt of the Demand Letter, and notifying that the Board referred the matters raised in the Demand Letter to the DRC for investigation and recommendation. The letter stated that DRC was composed of Board members Dailey and Wynaendts, and that the DRC retained counsel (the "DRC Counsel") to aid in the conduct of an investigation of the matters raised buy the Demand Letter.

180. On August 30, 2021, Plaintiffs' counsel sent a letter to DRC Counsel following up on the above-referenced Demand Letter and reiterating Plaintiffs' concerns raised in an earlier telephone call with DRC Counsel that Dailey is not independent and disinterested, and, therefore, should not be serving on the DRC. This was so because Dailey served as an assistant national bank examiner and as senior deputy controller, bank division at the OCC. In that capacity, Dailey had direct involvement in regulatory review of Citibank regarding some of the very same issues and over the same period of time as addressed in the Demand Letter. In addition, the letter stated

that Wynaendts was not independent and disinterested, and therefore, should also not be serving on the DRC. Plaintiffs' counsel noted that Wynaendts had served as CEO and Chairman of the board of Aegon N.V. ("Aegon") and that Citigroup and Aegon have substantial ties.

181. On November 24, 2021, DRC Counsel wrote Plaintiffs' counsel advising that Wynaendts resigned from the Board and DRC effective November 19, 2021, and committing to provide an update if the Board appointed a new member/members to the DRC.

182. On March 23, 2022, Plaintiffs' counsel, not having received the promised update, wrote DRC Counsel requesting an update regarding the progress of the DRC's investigation, and whether the investigation had, more than 13 months after the Demand was made, reached a point where the process and progress could be shared, and requesting further responses to 13 specific questions.

183. On April 8, 2022, DRC Counsel wrote to Plaintiffs' counsel reporting that two months earlier, on February 9, 2022, the Board appointed Defendant Henry to serve on the DRC in Wynaendts' stead.

184. On May 9, 2022, Plaintiffs' counsel sent a follow-up letter to DRC Counsel, noting that 14 months elapsed since the initial Demand Letter was issued. Plaintiffs' counsel highlighted that Citigroup's failure to timely and meaningfully respond to any of Plaintiffs' specific issues and follow-up questions "belies the seriousness of the DRC's activities and violates the fiduciary duties of both the DRC and the Board to our clients and all Citi shareholders." Counsel noted that a "board may not simply 'brush-off' the demand letter by responding that the allegations are under investigation."

## I. The Board's Wrongful Refusal

185. On May 19, 2022, DRC Counsel wrote Plaintiffs' counsel (the "Demand Refusal") reporting that the DRC issued its recommendation that no litigation was justified against any current or former Director, officer, or employee of Citigroup with respect to the matters raised by Plaintiffs in the Demand Letter. Based on the DRC's recommendations, the Board "determined that it is not in the best interests of Citigroup to initiate litigation or other proceedings regarding the matters set forth in the [Demand Letter]."

186. Specifically, the Demand Refusal (attached hereto as Exhibit B) provided:

> The Committee determined that, based on the record developed in its investigation, there was no factual or legal basis on which to assert failure-of-oversight claims against current or former outside directors or breach of fiduciary duty claims against management directors or current or former members of management based on the issues underlying the 2020 Consent Orders, the Revlon payment, or other issues raised in the Shareholder Demands. The evidence from the Committee's review established that, throughout the periods relevant to those matters, the Company had established and was continuing to enhance compliance and reporting policies and procedures, as well as taking other remedial actions in response to concerns and issues identified internally or by regulators or enforcement authorities. For example, the Committee found that:
>
> - Citigroup had in place policies and controls governing AML, risk management, data management, internal controls, management accountability, and other processes and programs identified in or related to matters raised in the Shareholder Demands;
>
> - Senior management and others within the Company promptly escalated to the Board, including relevant Board Committees, regulatory concerns, questions, and findings, as well as other issues or incidents relating to the operation and effectiveness of these processes and programs, including the Revlon payment. The Board and relevant Board Committees also met and communicated directly with certain regulators throughout the relevant time period;
>
> - At the direction of senior management and the Board, the Company expended significant resources to remediate the concerns expressed by regulators, address identified issues, and improve and enhance existing policies and controls, including the commitment of increased financial investment, staffing, organizational and personnel changes, and training dedicated to a variety of functions; and

- The Board and senior management received regular reports on the development and progress of remedial actions, including feedback from regulators, and directed or approved modifications and enhancements to remedial plans in response to delays or other issues impacting the timely and successful completion of such plans.

187. The Demand Refusal also highlighted that the DRC and the Board "considered a variety of potential factors weighing for and against bringing such claims as well as the potential financial and operational benefits or consequences of instituting such litigation, including:"

- The difficulty of establishing causes of action based on the information developed in the Committee's review and investigation and the relevant legal standards, including the determination that each of the potential claims described in or arising from the subjects of the Shareholder Demands would almost certainly fail both factually and as a matter of law;

- The potential negative consequences that pursuing such litigation could have on the operation of Citigroup's business, including the likelihood that litigation against current directors and officers would result in significant disruption of the operations of the business and otherwise would be a substantial distraction with respect to customers, counterparties, employees, regulators, and the public;

- The fact that litigation against current or former directors and officers would likely require significant advancement and (given the low probability of success) indemnification for defense costs; and

- The absence of any further remedial objectives that litigation against current or former officers and directors would achieve given that the Company has appropriately remediated the identified weaknesses and/or enhanced relevant risk management, data management, internal controls, and compliance functions, and that the Company has already substantially improved management accountability.

## DERIVATIVE ALLEGATIONS OF WRONGFUL REFUSAL

188. Plaintiffs bring this complaint derivatively in the right and for the benefit of Citigroup, pursuant to Federal Rule of Civil Procedure 23.1 to redress injuries suffered by Citigroup as a direct result of the violations of fiduciary duties by the Individual Defendants. Citigroup is named as a nominal defendant solely in a derivative capacity.

189. This is not a collusive action to confer jurisdiction on this Court that it would not otherwise have.

190. Plaintiffs will adequately and fairly represent the interests of Citigroup and its public shareholders in enforcing and prosecuting their rights.

191. No legal basis for the Board's Demand Refusal has been established and there is ample reason to doubt the thoroughness and reasonableness of the investigation and the independence of those that purportedly performed the investigation.

192. First, the Demand Refusal is wrongful in that an independent, good faith, and reasonable investigation of the matters set forth in the Demand Letter was not conducted and the Demand Refusal is not the product of a reasonably informed decision. Simply stated, the Board's Demand Refusal was inconsistent with its duty of care to act on an informed basis, and it did not act in good faith consistent with its duty of loyalty.

193. For example, the Board refused to remove Dailey from the DRC despite her extensive OCC experience and prior historical regulatory direct oversight of Citigroup. Dailey's prior work as a Citigroup regulator presents her with a pure conflict of interest based on her historic role as a regulator and current role as a director of Citigroup, undermining the disinterest and impartiality required of the DRC. Instead of addressing Dailey's ability to be independent and without conflict based upon her prior experience, the Board concluded that Dailey's OCC experience does not represent: (i) a "material personal benefit from the alleged misconduct," (ii) that she faces a "substantial likelihood of liability on any of the claims that are the subject of the litigation demand," and (ii) that she "lacks independence from someone who" either "received a material personal benefit from the alleged misconduct" or "would face a substantial likelihood of liability." *See* Demand Refusal, footnote 2.

194. To the contrary, keeping Dailey on the DRC, given her extensive experience at the OCC, underscores the Company's intention to whitewash the review required of the Demand and presents as a matter of law, an irreconcilable conflict of interest that undermines the disinterest and independence required of the DRC in order for the DRC to fulfill its fiduciary duties associated with the investigation of the Demand.

195. Furthermore, the changes to the composition of the DRC, its lack of independence, and the lack of disinterest on the part of Defendant Dailey are a stain and taint on the process of the DRC's investigation, which prevented the conduct of a reasonable and proper investigation. The Board's vote to refuse the Demand based upon the DRC's investigation and recommendation, which lacked independence and disinterest, confirms that the whole process of review and investigation was not independent and disinterested and merely pretextual in order to exonerate the Board from liability.

196. Second, the Demand Refusal was made by the Board, rather than the DRC. However, the Demand Refusal makes no representation as to performing any investigation whatsoever as to the disinterest and independence of the Board. As shown below, the members of the Board are not independent or disinterested and did not act with the disinterest and independence required to fairly consider Plaintiffs' Demand

197. Third, the investigation undertaken by the DRC was also not conducted by disinterested and impartial counsel. DRC counsel associated with the Demand Refusal is the law firm Debevoise & Plimpton LLP ("Debevoise"). However, the Demand Refusal makes no representation as to performing any investigation whatsoever as to the independence of Debevoise, including but not limited to, whether Debevoise has represented Citigroup, its Board, any Board member(s), or any entity in which any of the Board members are control persons.

198. In fact, Debevoise is a firm that has closely worked with the Defendants and multiple Citigroup entities over at least the last ten years in a capacity that brings reasonable doubt to its ability to act with the requisite independence and disinterestedness required in connection with the review and investigation associated with Plaintiffs' Demand. In just the last five years, Debevoise worked on the same side as Citigroup and/or its subsidiaries in at least twelve (12) M&A deals. For instance, in October 2017, International Paper Company ("IPC") announced the sale of North America Consumer Packaging/International Paper to Graphic Packaging Holding Company. Citigroup served as financial advisor to IPC, while Debevoise served as IPC's legal counsel. Hence, the interconnected nature of Debevoise's substantive and material work on multiple M&A deals together with Citigroup or its subsidiaries gives rise to a reasonable doubt that Debevoise could act with the necessary independence and disinterest from Citigroup in connection with the Plaintiffs' Demand.

199. Fourth, The Demand Refusal does not indicate whether the purported investigation of Plaintiff's Demand uncovered wrongful or culpable conduct by any directors, officers or employees of Citigroup. As such, the Demand Refusal was not based upon a good faith investigation, as required.

200. Similarly, The Demand Committee failed to quantify the amount of time and resources necessary to bring the claims that are subject of the Demand;

201. Fifth, the Demand Refusal is wrongful because the inquiry and investigation undertaken was patently pretextual and fabricated to reach a foregone conclusion in contravention of the Board's fiduciary duty to reach an informed decision after the DRC made a reasonable and informed investigation. The investigation here is anything but reasonable and informed as evidenced by the fact that none of the regulators or regulatory agencies critical of Citigroup and

its subsidiaries and whose multiple findings of "longstanding failure to establish effective risk management" and who imposed billions of dollars of civil penalties against Citigroup were contacted as part of the investigation by the DRC in its purported investigation nor by the Board itself prior to authorizing the Demand Refusal. Rather, the DRC's investigation seems to have been limited to discussions with the accused and presentations of their excuses for myriad fiduciary failings.

202. The Demand Refusal does not identify or refer to any interview of witnesses, and certainly makes no representation that it discussed with the OCC or the Federal Reserve, or any regulator or investigator the specific conduct at issue.

203. Sixth, the Demand Refusal states that the Board determined that pursuing claims against those responsible would not be in the best interests of Citigroup, but does not provide any facts upon which that determination was made. As such, the Demand Refusal and the good faith of those who made that Demand Refusal are subject to reasonable doubt.

204. Seventh, the Demand Refusal is wrongful for the additional reason that the fifteen months that elapsed from the time of the making of the Demand until the Demand Refusal demonstrates the slow walking of the DRC's review and the failure to make a timely investigation consistent with its fiduciary duties, especially in light of the amount of documents claimed to have been reviewed, the failure to identify the number of witnesses interviewed, if any, and the failure to promptly notify Plaintiffs' Counsel of the new additional member added to the DRC three months after he joined the DRC.

205. Eighth, the Demand Refusal is wrongful because it contradicts the express and repeated contrary findings of fact by multiple regulatory agencies (to which Citigroup admitted) which held in sum and substance that: "**Citigroup lacked adequate firm-wide governance, risk**

**management, compliance and audit policies and procedures" to properly oversee that its subsidiaries' foreign trading activities "complied with safe and sound banking practices**"; "**Citigroup's deficient policies and procedures prevented Citigroup from detecting and addressing [the] unsafe and unsound conduct**"; the "**Board and senior management oversight is inadequate to ensure timely, appropriate actions to correct the serious and longstanding deficiencies and unsafe or unsound practices in the areas of risk management, internal controls, and data governance at the bank. Furthermore, inadequate reporting to the Board hinders its ability to provide effective oversight**"; and the October 2020 findings that "**Board and senior management oversight is inadequate to ensure timely, appropriate actions to correct the serious and longstanding deficiencies and unsafe or unsound practices in the areas of risk management, internal controls, and data governance at the bank. Furthermore, inadequate reporting to the Board hinders its ability to provide effective oversight**."

206. Moreover, the Demand Refusal contradicts the Company's own public acknowledgement that its "risk and control environment" was "not yet where we need to be and that has to change," and contradicts the Company's own admission that its payment to Revlon creditors of $900 million that was not even due resulted from "unacceptable" control failures.

207. Ninth, the Demand Refusal is wrongful because there is reasonable doubt that the DRC and Board possessed the requisite disinterest and independence since there is a substantial likelihood that the Individual Defendants who are current members of the Board will be found liable for violating federal securities laws and for breaches of fiduciary duty since they signed the false and misleading Proxy Statements, as set forth above, making them incapable of exercising the requisite independence and disinterestedness required to review the Demand;

208. Tenth, the Demand Refusal is wrongful because there is reasonable doubt that Citigroup's directors could and did act with the required independence and disinterestedness in considering the Demand because:

(a) Defendants Turley, Costello, Dailey, Dugan, Hennes, and James lack independence for purposes of considering the Demand because they, in addition to being directors, were Audit Committee members who were responsible for monitoring the Company's compliance with applicable laws, rules, and regulations. The Audit Committee members' breaches of fiduciary duties caused the Company's deficiencies in enterprise-wide risk management, compliance risk management, data governance, and internal controls that have resulted in massive liability for the Company. Accordingly, these Defendants face a substantial threat of liability for their actions and inactions as Audit Committee members and, therefore, are unable to independently consider the Demand and are not and were not disinterested for purposes of considering the Demand.

(b) The Individual Defendants, as officers and directors of Citigroup, pursuant to the Company's Ethics, Conduct and Culture Committee Charter, were required to ensure compliance with all laws and regulations relevant to the business, including ensuring management, minimization, and mitigation of Citi's conduct risks. Furthermore, the Ethics, Conduct and Culture Committee Charter required the Individual Defendants to accurately report material, non-public information. In violation of their fiduciary duties, these Defendants failed to perform that required role. The Company, because of these failures, was in

violation of federal laws, rules and regulations, and has been subject to the Consent Orders, a $400 million fine, public rebuke arising from enterprise-wide internal controls and risk-management deficiencies, which require new remedial efforts, and the imposition of significant restrictions on Citigroup's operations going forward;

(c) As CEO, Defendant Fraser lacks independence as a director as a result of her managerial position with the Company;

(d) Defendants Hennes, Henry, Reiner, Taylor, and Turley participated in and oversaw the breaches of fiduciary duty and wrongful conduct alleged in the Demand Letter as directors of Citigroup during the time period that the misconduct took place. Accordingly, these Director Defendants face a substantial likelihood of liability for those actions and were not disinterested for purposes of considering the Demand;

(e) Defendants Hennes, Costello, Dailey, Desoer, Dugan, and Truly lack independence for purposes of considering the Demand because they, in addition to being directors, were Risk Management Committee members who were responsible for monitoring risks to the Company, but failed to take any action regarding the material risks caused to the Company as described herein. The Risk Management Committee members' breaches of fiduciary duties caused Citigroup's deficiencies in enterprise-wide risk management, compliance risk management, data governance, and internal controls that have resulted in massive liability for the Company. Accordingly, these Defendants fact a substantial threat of liability for their actions and inactions as Risk Management

Committee members and, therefore, are unable to independently consider the Demand and are not and were not disinterested for purposes of considering the Demand; and

(f) Defendants Costello, Dailey Desoer Dugan, Hennes, Henry, Ireland, James, and Turley are named defendants in the Securities Class Action. Suit by the current directors of Citigroup to remedy the wrongs complained of herein would expose Defendants Costello, Dailey Desoer Dugan, Hennes, Henry, Ireland, James, and Turley to liability for violations of the federal securities laws and compromise their defenses in the pending Securities Class Action. Accordingly, they are unable to independently consider the Demand and are not and were not disinterested for purposes of considering the Demand.

209. Eleventh, the Demand Refusal is wrongful because there is reasonable doubt that the DRC's and Board's investigation of the Demand was thorough and informed since the Demand Refusal does not report that the Board has taken any action to claw back compensation or bonuses from culpable actors responsible for the Company's losses irrespective of the fact that such action would not require litigation and can be done with minimal effort.

210. Twelfth, the Demand Refusal is wrongful because there is reasonable doubt that the DRC's and Board's investigation of the Demand was thorough and informed since no disciplinary action whatsoever has been reported as having been administered, leaving the culpable parties to continue to receive substantial salaries, bonuses, payments, and benefits, irrespective of the fact that such action does not require litigation and can be accomplished with minimal effort.

211. In sum, the Board's failure to conduct a bona fide investigation into the allegations raised in the Demand, coupled with its utter disregard of the actual merits of the claims set forth

in the Demand is improper and demonstrates the Board's lack of diligence and good faith. Thus, entire "process" was procedurally deficient. Further, the conclusions reached by the Refusal are inexplicable.

212. Accordingly, the Board's refusal of Plaintiffs' Demand was irrational, unreasonable and taken in bad faith. Moreover, the Board did not act on an informed basis, and did not adequately investigate the issues raised in the Demand. As such, its refusal of the Demand is not protected by the business judgment rule.

213. Plaintiffs have no adequate remedy at law and are forced to bring this equitable action in the name and right of the Company to protect its interests and those of its stockholders.

## COUNT I

## VIOLATIONS OF SECTION 14(A) OF THE EXCHANGE ACT

214. Plaintiffs incorporate by reference and reallege each and every above allegation as though fully set forth herein.

215. The Section 14(a) Exchange Act claim alleged herein are based solely on negligence. They are not based on any allegation of reckless or knowing conduct by or on behalf of the Individual Defendants. The Section 14(a) Exchange Act claims alleged herein do not allege and do not sound in fraud. Plaintiffs specifically disclaim any allegation of, reliance upon any allegation of, or reference to any allegation of fraud, scienter, or recklessness with regard to these non-fraud claims.

216. The Individual Defendants negligently issued, caused to be issued, and participated in the issuance of materially misleading written statements to stockholders in the aforementioned Proxy Statements. The Proxy Statements contained a description of the Company's oversight of risk management, however, that description misrepresented and failed to disclose that the

Company's internal controls were inadequate, and that the Board was not composed of members who could effectively perform oversight duties and had failed to provide appropriate risk oversight of the Company's activities. By reason of the conduct alleged herein, the Individual Defendants violated Section 14(a) of the Exchange Act. As a direct and proximate result of their wrongful conduct, Citigroup misled and/or deceived its stockholders by making misleading statements and omissions that were an essential link in its stockholders heeding Citigroup recommendation to approve the election of certain individuals to the Board.

217. The misleading information contained in the Proxy Statements were material to Citigroup's stockholders in determining whether or not to elect certain individuals to the Board. The solicitation process in connection with the Proxies was an essential link in the approval of the election of these individuals to the Board.

218. Plaintiffs, on behalf of Citigroup, seek relief for damages inflicted upon the Company based upon the misleading Proxies in connection with the improper election of certain individuals to the Board.

## COUNT II

## AGAINST ALL DEFENDANTS FOR BREACH OF FIDUCIARY DUTIES

219. Plaintiffs incorporate by reference all preceding and subsequent paragraphs as if fully set forth herein.

220. Plaintiffs fairly and adequately represent the interests of the Company and have made proper demand upon the Company's Board of Directors.

221. By reason of their fiduciary relationships, the Individual Defendants specifically owed and owe Citigroup and its stockholders, fiduciary duties of care, loyalty, good faith, candor and oversight.

222. The Individual Defendants violated and breached their statutory and common law fiduciary duties.

223. As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

224. The Individual Defendants' failures were not an exercise of reasonable business judgment.

225. As a direct and proximate result of the Individual Defendants' failures to faithfully perform their fiduciary obligations, Citigroup has sustained material financial and reputational damages. As a result of the misconduct alleged herein, the Individual Defendants are liable to Citigroup and its stockholders.

226. Plaintiffs, on behalf of Citigroup, have no adequate remedy at law. Only through the exercise of this Court's equitable powers can Plaintiffs, on behalf of Citigroup and its stockholders, be fully protected from the immediate and irreparable injury that the Individual Defendants' actions have inflicted and threaten to inflict.

## COUNT III

## AGAINST ALL DEFENDANTS FOR GROSS MISMANAGEMENT

227. Plaintiffs incorporate by reference and realleges each and every allegation set forth above, as though fully set forth herein.

228. Plaintiffs fairly and adequately represent the interests of the Company and have made proper demand upon the Company's Board of Directors.

229. Defendants had a statutory and common law duty to Citigroup and its shareholders to prudently supervise, manage and control the operations, business and internal controls of the Company.

230. Defendants, by their actions and by engaging in the wrongdoing described herein, abandoned and abdicated their responsibilities and duties with regard to prudently managing the businesses of Citigroup in a manner consistent with the duties imposed upon them by statutory and common law. By committing the misconduct alleged herein, Defendants breached their statutory and common law duties of due care, diligence and candor in the management and administration of Citigroup's affairs and in the use and preservation of Citigroup's assets.

231. During the course of the discharge of their duties, Defendants knew or recklessly disregarded the unreasonable risks and losses associated with their misconduct, yet Defendants caused Citigroup to engage in schemes complained of herein which they knew had an unreasonable risk of damage to Citigroup, thus breaching their statutory and common law fiduciary duties to the Company. As a result, Defendants grossly mismanaged Citigroup.

## COUNT IV

## AGAINST ALL DEFENDANTS FOR UNJUST ENRICHMENT

232. Plaintiffs incorporate by reference and realleges each and every allegation set forth above, as though fully set forth herein.

233. Plaintiffs fairly and adequately represent the interests of the Company and have made proper demand upon the Company’s Board.

234. By their wrongful acts and omissions, the Defendants were unjustly enriched at the expense of and to the detriment of Citigroup.

235. An inequity exists due to Defendants’ unjust enrichment at Citigroup's expense and detriment.

236. Plaintiffs, as shareholders and representatives of Citigroup, seek restitution from these Defendants, and each of them, and seek an Order of this Court disgorging all profits, benefits,

and other compensation obtained by these Defendants, and each of them, from their wrongful conduct and fiduciary breaches.

## COUNT V

## AGAINST ALL DEFENDANTS FOR INDEMNIFICATION

237. Plaintiffs incorporate by reference and realleges each and every above allegation as though fully set forth herein.

238. The Individual Defendants violated their fiduciary duties of loyalty, good faith, and due care. Citigroup has suffered significant injury as a result of the Individual Defendants' breaches of fiduciary duty as alleged herein. Plaintiffs, on behalf of the Company, seek relief from the Individual Defendants on the theory of indemnity for all damages that occurred as a result of the Individual Defendants' violations of their fiduciary obligations.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs demand judgment as follows:

A. Awarding against all Defendants and in favor of Citigroup the amount of damages sustained by it as a result of Defendants' breaches of statutory and common law fiduciary duties and gross mismanagement.

B. Directing Citigroup to take all necessary action to reform and improve its compliance, internal control systems and corporate governance practices and procedures to comply with applicable laws and protect the Company and its stockholders from a repeat of the damaging events described herein, and taking such other action as may be necessary;

C. Awarding Citigroup restitution from Defendants, and each of them, and ordering disgorgement of all profits, benefits and other compensation obtained by the Defendants;

D. Awarding to Plaintiffs the costs and disbursements of the action, including reasonable attorneys' fees, accountants' and experts' fees, costs, and expenses; and

E. Granting such other and further relief as the Court deems just and proper.

**JURY TRIAL DEMANDED**

Plaintiffs hereby demand a trial by jury.

Dated: August 2, 2022

Respectfully submitted,

By: *s/ Mark D. Smilow*

Mark D. Smilow
David C. Katz
WEISSLAW LLP
305 Broadway, 7th Floor
New York, New York 10007
Telephone: (212) 682-3025
Facsimile: (212) 682-3010
Email: msmilow@weisslawllp.com
dkatz@weisslawllp.com

*Attorneys for Plaintiffs Solomon Lipshutz and Jeweltex Manufacturing Inc. Retirement Plan*

# VERIFICATION

I, Solomon Lipshutz, hereby verify that I am a stockholder of Citigroup Inc. ("Citigroup" or the "Company"), was a stockholder at the time of the transactions complained of in the Verified Stockholder Demand Refused Derivative Complaint ("Complaint"), and have continuously held Citigroup stock at all relevant times herein. I am ready, willing, and able to pursue this shareholder derivative action on behalf of Citigroup. I have reviewed the allegations in the Complaint, and as to those allegations of which I have personal knowledge, I know those allegations to be true, accurate and complete. As to those allegations of which I do not have personal knowledge, I rely on my counsel and their investigation, and for that reason I believe them to be true. Having received a copy of the foregoing complaint, and having reviewed it with my counsel, I hereby authorize its filing.

Dated: August 2 2022

Solomon Lipshutz

# VERIFICATION

I, Barry Rosenfeld, trustee of the Jeweltex Manufacturing Inc. Retirement Plan ("Jeweltex"), hereby verify that Jeweltex is a stockholder of Citigroup Inc. ("Citigroup" or the "Company"), was a stockholder at the time of the transactions complained of in the Verified Stockholder Demand Refused Derivative Complaint ("Complaint"), and has continuously held Citigroup stock at all relevant times herein. Jeweltex is ready, willing, and able to pursue this shareholder derivative action on behalf of Citigroup. On behalf of Jeweltex I have reviewed the allegations in the Complaint, and as to those allegations of which I have personal knowledge, I know those allegations to be true, accurate and complete. As to those allegations of which I do not have personal knowledge, I rely on my counsel and their investigation, and for that reason I believe them to be true. Having received a copy of the foregoing complaint, and having reviewed it with my counsel, I hereby authorize its filing on behalf of Jeweltex.

Dated: August 31, 2022

Barry Rosenfeld, Trustee of Jeweltex
Manufacturing Inc. Retirement Plan